Gregg **HOSS**, Appellant/Cross–Appellee,

v.

Anthony **ALARDIN**, **SiteWatch LLC**, d/b/a **SiteWatch Systems**, and **Alardin Development Corporation**, d/b/a **Remote Monitoring Technologies**, Appellees/Cross–Appellants.

No. 05–08–01192–CV.

Court of Appeals of Texas, Dallas.

March 7, 2011.

Rehearing Overruled April 27, 2011.

Jack Balderson, Jr., Jill Campbell Penn, Nicole Williams, Scott P. Stolley, Thompson & Knight, L.L.P., Dallas, TX, for Appellant/Cross–Appellee.

Ryan Brown, Michael E. Heygood, Heygood, Orr, Reyes Pearson & Bartolomei, F. Leighton Durham, III, Kirk L. Pittard, Kelly, Durham & Pittard, LLP, Dallas, TX, for Appellees/Cross–Appellants.

Before Justices MORRIS, FITZGERALD, and FRANCIS.

## OPINION

Opinion By Justice FITZGERALD.

Gregg Hoss and others sued appellees on several claims including breach of certain loan agreements. Anthony Alardin filed a separate lawsuit against Hoss for breach of fiduciary duty. The cases were consolidated and tried to a jury, which awarded Hoss a total of about $182,000 plus attorneys' fees against appellees and awarded Alardin $3 million on his claim against Hoss. The trial court rendered judgment largely in accordance with the jury's verdict. Hoss appealed, and appellees cross-appealed. We reverse and render in part, we affirm in part, and we reverse and remand in part.

## I. BACKGROUND

### A. Facts

The evidence at trial supported the following facts and series of events. Hoss owned a company called Hoss Equipment Co. (HEC), which is a heavy-equipment dealer he founded in 1990. Alardin founded a company called Alardin Development Corporation in 1998 or 1999, and it began doing business under the name Remote Monitoring Technologies (RMT) in March 2001. Hoss and his wife Angela were friends of Alardin and his wife Kathryn.

At some time before September 2001, Alardin began trying to develop a surveillance technology that would allow customers to install video cameras wherever they liked and monitor those cameras over the internet from anywhere in the world. He even started building such a surveillance

system in his home garage and office. He called it the "autonomous mobile ethernet video surveillance system," or AMEVSS.

Because Alardin lacked business sophistication and knew that Hoss possessed business experience, he told Hoss about his efforts to develop the AMEVSS. On or about September 14, 2001, Hoss made or caused HEC to make an initial investment, loan, or purchase in the amount of $25,000 (the evidence of the nature of this transaction is conflicting), and Hoss also donated some equipment for use in building an AMEVSS prototype. Alardin testified that he and Hoss orally agreed to become partners at that time. No written partnership agreement was ever executed.

From 2001 to early 2005, Alardin worked on the surveillance-system project, which was given the name "SiteWatch." Hoss allowed Alardin to set the SiteWatch project up at an HEC facility. Hoss also assigned HEC personnel to assist Alardin in the SiteWatch project. In 2004, Alardin formed a new company called SiteWatch LLC d/b/a SiteWatch Systems.[1] Some evidence suggests that Alardin transferred all of RMT's business relating to the SiteWatch project to SiteWatch LLC in September 2004, but other evidence indicates that RMT continued to operate through March 2005.

In March 2005, Alardin and some others went to a trade show in Las Vegas called ConExpo to display the SiteWatch surveillance system. During the show, a disagreement developed between Alardin and an HEC employee named David Yancey. Later, after everyone had returned to Texas, the Hosses and Yancey met with Alardin at a restaurant, and a heated argument broke out. Shortly after that incident, Alardin was told not to visit the HEC yard

without making an appointment first, and a lock was put on his office door. On or about April 21, 2005, Alardin typed a three-page "Chronology of events" that described some of the history of the SiteWatch project and listed "loans or notes" that he, Gregg Hoss, and Angela Hoss had made towards the SiteWatch project from 2001 to September 2004. A redacted version of that chronology was admitted at trial.

## B. Procedural history

This lawsuit began as a suit by Hoss, Angela Hoss, and HEC against Alardin and SiteWatch LLC. By the time of trial, Hoss and the other plaintiffs had amended their pleadings and added RMT as a defendant. They pleaded several claims, but for our purposes it is sufficient to note that Hoss sued all three appellees for breach of contract, alleging that they had failed to repay certain loans. He sought damages for breach of contract and attorneys' fees under chapter 38 of the civil practice and remedies code.

Alardin, SiteWatch LLC, and RMT filed a separate lawsuit against Hoss, an individual named Nyle Brasch who had worked on the project, and others, but that lawsuit was eventually consolidated into Hoss's lawsuit against them. They pleaded numerous claims, but for our analysis we note only two of them. First, Alardin claimed that he and Hoss orally formed a partnership and that Hoss breached his fiduciary duty arising from that partnership. Second, all appellees sued Hoss for breach of contract, specifically, breach of the oral partnership agreement. The trial court dismissed appellees' breach-of-con-

---

1. We refer to this entity as "SiteWatch LLC" to avoid confusion with the general SiteWatch project.

tract claims on Hoss's motion for summary judgment.

The remaining claims were tried to a jury, which found in favor of Hoss on his contract claims and in favor of Alardin on his fiduciary-duty claim. The jury rejected all of the parties' other claims.[2] As to Hoss's contract claims, the jury found that Alardin owed Hoss $117,481, SiteWatch LLC owed Hoss $36,631, and RMT owed Hoss $27,998. The jury also found that Hoss's recoverable attorneys' fees were $500,000 for preparation and trial, $100,000 for an appeal to the court of appeals, and $50,000 for an appeal to the Texas Supreme Court. As to Alardin's claim, the jury found that a partnership existed between Hoss and Alardin, and that Hoss did not comply with the fiduciary duty he owed to Alardin. The jury awarded Alardin $3 million against Hoss as damages.

The trial judge signed a judgment that awarded Alardin and Hoss the amounts found by the jury. The parties filed various posttrial motions, and the judge then signed an amended final judgment that reduced Alardin's recovery against Hoss to $2,822,519[3] but still awarded Hoss $117,481 against Alardin, $36,631 against SiteWatch LLC, and $27,998 against RMT. The parties filed post-judgment motions that were overruled by operation of law. Hoss appealed, and appellees cross-appealed.

## II. Hoss's Appeal

Hoss raises four issues on appeal: (1) the evidence is legally and factually insuffi-

cient to support the jury's finding that he and Alardin entered a partnership, (2) the jury's failure to find that Hoss complied with his fiduciary duty to Alardin was against the conclusive evidence or the great weight and preponderance of the evidence, (3) the evidence is legally and factually insufficient to support the jury's finding that Alardin's damages were $3 million, and (4) the trial court erred by failing to offset Hoss's awards against Alardin's award.

## A. Existence of a partnership

We first consider whether sufficient evidence supports the jury's finding that a partnership existed between Hoss and Alardin.

### 1. Standard of review

When an appellant attacks the legal sufficiency of the evidence to support an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that no evidence supports the finding. *Cerullo v. Gottlieb*, 309 S.W.3d 160, 165 (Tex.App.-Dallas 2010, pet. denied). "When evidence is so weak as to do no more than create a surmise or suspicion of the matter to be proved, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Guevara v. Ferrer*, 247 S.W.3d 662, 668 (Tex.2007) (internal quotations and citation omitted). The evidence is legally sufficient if it is sufficient to enable reasonable and fair-minded people to reach the verdict under review. *City of*

---

**2.** The jury rejected the following claims: (1) Angela Hoss's assault claim against Alardin and her claims for breach of contract against all three appellees, (2) HEC's breach-of-contract claim against appellees, (3) Nyle Brasch's breach-of-fiduciary-duty claim against Alardin, and (4) Alardin's, SiteWatch LLC's, and RMT's conversion claims against Hoss, Brasch, HEC, and a company called Hoss Equipment Nevada, Inc.

**3.** The amended judgment recites that this amount was calculated by subtracting from $3 million the "$177,481.00 found by the jury as the amount owed to Gregg Hoss by Anthony Alardin." This was a mistake, because the jury actually awarded Hoss $117,481 against Alardin.

*Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005).

In conducting our review, we view the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id.* at 822. We must credit evidence favorable to the verdict if a reasonable person could, and we must disregard contrary evidence unless a reasonable person could not. *Id.* at 827. "Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony." *Id.* at 819 (footnote omitted). But the jury's credibility determinations must be reasonable; "[j]urors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Id.* at 820.

**2. The jury's finding and Texas partnership law**

The jury answered "yes" to Question 16 of the jury charge, which inquired, "Did a partnership exist between Anthony Alardin and Gregg Hoss?" Question 16 was accompanied by the following three paragraphs of instructions:

An association of two of more persons to carry on a business for profit as owners creates a partnership, regardless of whether: (1) the persons intend to create a partnership or (2) the association is called a "partnership", "joint venture", or other name.

Factors indicating the creation of a partnership include: (1) receipt or right to receive a share of profits of the business; (2) expression of intent to be partners in the business; (3) participation or right to participate in control of the

business; (4) sharing or agreeing to share losses and liabilities of the business, and (5) contributing or agreeing to contribute money or property to the business.

A general partnership agreement may or may not be in writing.

The first two paragraphs of the instructions closely track provisions of the Texas Revised Partnership Act, with one exception we will note later. *See generally* Act of May .31, 1993, 73d Leg., R.S., ch. 917, § 1, 1993 Tex. Gen. Laws 3887, 3890 (expired Jan. 1, 2010) (former articles 6132b–2.02(a), 6132b–2.03(a)) (cited hereafter as "TRPA art. ——").[4] Under the TRPA, "[a] partnership is an entity distinct from its partners." TRPA art. 6132b–2.01.

■■■ The Texas Supreme Court has described the TRPA as adopting a "totality-of-the-circumstances test" for partnership formation. *Ingram v. Deere,* 288 S.W.3d 886, 896 (Tex.2009). "[T]he issue of whether a partnership exists should be decided considering all of the evidence bearing on the TRPA partnership factors." *Id.* In *Ingram,* the court acknowledged that the totality-of-the-circumstances test would be difficult to apply uniformly, but it offered a few guidelines for application. *Id.* at 898. An absence of evidence as to all five factors will preclude the recognition of a partnership under the TRPA, and even conclusive evidence of only one factor will normally be insufficient to establish the existence of a partnership. *Id.* At the other end of the spectrum, conclusive evidence of all five factors will establish the existence of a partnership as a matter of law. *Id.; see also Reagan v. Lyberger,* 156 S.W.3d 925, 928 (Tex.App.-Dallas 2005, no

---

4. Although the TRPA expired on January 1, 2010, it was in effect during all of the events made the basis of this lawsuit. General partnerships are now governed by chapter 152 of the Texas Business Organizations Code. *See* *generally* TEX. BUS. ORGS. CODE ANN. §§ 152.001–.914 (West 2010). For a survey of the three statutory regimes that have governed Texas partnerships, see *Ingram v. Deere,* 288 S.W.3d 886, 894–95 n. 4 (Tex.2009).

pet.) (upholding finding of partnership because all five TRPA factors were supported by evidence). Points on the spectrum between the extremes will present the "challenge" of the totality-of-the-circumstances test. *Ingram,* 288 S.W.3d at 898. In *Ingram* itself, the court held that the proponent of the partnership agreement adduced no evidence of any of the five factors, and thus that there was no partnership as a matter of law. *Id.* at 904; *see also Smith v. Deneve,* 285 S.W.3d 904, 913–15 (Tex.App.-Dallas 2009, no pet.) (affirming summary judgment as to partnership claim because nonmovant adduced no evidence of the five TRPA factors).

According to the statutory comment prepared by the Partnership Law Committee of the Business Law Section of the State Bar of Texas, "it is not feasible to say exactly which factors [listed in article 6132b–2.03(a)] must be present, or what the relative weights of the factors should be." TRPA art. 6132b–2.03 cmt. But the commentators further note that the sharing of profits and control have traditionally been regarded as the most important factors, and "[t]hey will probably continue to be the most important under this section." *Id.; accord Big Easy Cajun Corp. v. Dallas Galleria Ltd.,* 293 S.W.3d 345, 348 (Tex.App.-Dallas 2009, pet. denied). The TRPA specifically provides that an agreement to share losses is not a required element of a partnership. TRPA art. 6132b–2.03(c).

### 3. Evidence of the TRPA factors

Like the supreme court in *Ingram,* 288 S.W.3d at 898–903, we focus our inquiry on the evidence pertaining to each of the five TRPA factors.

#### a. Profit sharing

The first TRPA factor is "receipt or right to receive a share of profits of the business." TRPA art. 6132b–2.03(a)(1).

The *Ingram* court held that this factor is not satisfied by an agreement to share gross revenues. 288 S.W.3d at 899. Rather, the TRPA requires a sharing or a right to share profits, defined as the excess of revenues over expenditures in a business transaction. *Id.* In *Ingram,* two parties agreed that they would use one-third of their business's gross revenues to pay expenses and divide the remaining two-thirds equally between them. *Id.* at 898. The court held that this constituted no evidence of the first TRPA factor because the parties' agreement concerned gross revenues, not profits. *Id.* at 898–99.

Alardin cites no evidence that during the time period in question, 2001–2005, he or Hoss actually received any profits from the venture, and we have found none. Alardin testified that the alleged partnership did generate revenue, but he did not testify how much, if any, of that revenue was profit. He testified that any profits made by the partnership were reinvested, so according to Alardin, he and Hoss did not actually implement the 50–50 split that Alardin testified they agreed to, a fact that is inconsistent with Alardin's claim. Hoss testified that the products made by the alleged partnership never made a profit.

Alardin argues that the evidence shows that he and Hoss orally agreed to share profits, pointing to his own testimony as follows:

Q. Did y'all specifically agree to be partners?

A. We specifically did.

Q. Gregg [Hoss] agreed?

A. Gregg did agree.

Q. What kind—how were y'all going to work that in terms of how y'all were going to split profits?

A. We were going to split profits 50–50.

. . .

Q: You go on here [in the chronology Alardin wrote on April 21, 2005], and the next part we talk about is, you're kind of describing what y'all had agreed to after the fact, that Gregg was going to get repaid for these things, the money he put in, and the reimbursement of parts, and the shop costs. Do you see that?

A: Yes, I do.

Q. What was the specific agreement between you and Greg[g] on how you and he were going to get paid for the various things that you each put into the partnership?

A. We would have to have an accounting, obviously, and that's what I think—I may even say it there on that [document]. But out of the 50–50, we would try to pay him back out of his—out of that first.

Q. Out of his profits, his side of the profits, he would get paid back for whatever he put in?

A. Exactly.

Q. And that's how you would get paid back for the labor that you put in?

A. And the years of putting this together and transferring everything and, you know, the manufacturing and all of that, yes.

We conclude that Alardin's testimony constitutes some evidence of an agreement to share profits, but that the evidence in support of this agreement is weak and self-contradictory. At first, Alardin testified unequivocally, "We were going to split profits 50–50." This testimony tends to support the first TRPA factor, although it also could be interpreted to be an agreement to agree. Alardin further testified Hoss was going to be paid back for what he put into the partnership "out of the 50–50," thus controverting his initial testimony. Finally, in answer to a leading question, Alardin agreed that he meant that Hoss would get paid back for whatever he put into the partnership "[o]ut of his profits, his side of the profits." Alardin's testimony that Hoss's loans would be paid back to him out of his 50% of the profits clearly contradicted his testimony that the profits would be split 50–50.[5] If, according to Alardin, Hoss's loans were in fact to be repaid out of Hoss's share of profits, then the parties did not agree that the profits would be split evenly between them. Alardin's explanation of how Hoss's loans would be repaid skews the calculations and undermines Alardin's testimony that the parties agreed to split profits evenly.

We conclude that Alardin adduced no evidence that he or Hoss actually received any profits of the alleged partnership. We further conclude that Alardin's testimony produced only weak and self-contradictory evidence that he and Hoss made an agreement to share profits. Nonetheless, given Alardin's statement that profits were going to be split "50–50," there was some evidence of the first TRPA factor, at least insofar as it relates to the right to receive profits as contrasted with the actual receipt of profits.

---

5. Occasionally during his testimony, Alardin would use "loans" and "contributions" interchangeably. In context, this is a distinction without a difference in view of Alardin's testimony that he did not know what a "capital contribution" was before this lawsuit was filed, and in view of Alardin's testimony that this money, whether a loan or contribution, would be repaid to Hoss out of Hoss's share of profits. In addition, Alardin's own chronological summary, contained in a document entitled "SiteWatch LLC dba SiteWatch Systems," explains events but refers only to loans, not to contributions. Finally, the jury found Alardin agreed to repay monies advanced by Hoss, thus finding the monies advanced were loans.

### b. Expression of intent to be partners

■ The second TRPA factor is "expression of an intent to be partners in the business." TRPA art. 6132b–2.03(a)(2). The *Ingram* court clarified that this TRPA factor is distinct from the other factors, and therefore we "should only consider evidence not specifically probative of the other factors" when we evaluate this factor. 288 S.W.3d at 900. "[C]ourts should review the putative partners' speech, writings, and conduct." *Id.* at 899. "Evidence of expressions of intent could include, for example, the parties' statements that they are partners, one party holding the other party out as a partner on the business's letterhead or name plate, or in a signed partnership agreement." *Id.* at 900. But the *Ingram* court cautioned that "merely referring to another person as 'partner' in a situation where the recipient of the message would not expect the declarant to make a statement of legal significance is not enough." *Id.* Thus, we must "look to the terminology used by the putative partners, the context in which the statements were made, and the identity of the speaker and listener." *Id.* Moreover, "there must be evidence that *both* parties expressed their intent to be partners." *Id.* (emphasis added); *see also Reagan*, 156 S.W.3d at 928 (holding that there was some evidence of second TRPA factor where both alleged partners referred to themselves as partners).

In support of the second TRPA factor, Alardin relies on his own testimony that he and Hoss orally agreed to be "partners":

Q. Did you and Gregg [Hoss] have a partnership agreement?

A. Absolutely.

Q. Did you and he agree to be partners in this SiteWatch project?

A. We did, yes, sir.

. . .

Q. Did y'all specifically agree to be partners?

A. We specifically did.

Q. Gregg agreed?

A. Gregg did agree.

Alardin also refers us to Hoss's trial testimony describing the parties' relationship, in which Hoss testified, "[I was p]artnering with Tony to try and get him into a business where he could be successful."

"The terms used by the parties in referring to the arrangement do not control. . . ." *Ingram*, 288 S.W.3d at 900; *accord Coastal Plains Dev. Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 288 (Tex.1978). *Ingram* instructs us that the context in which statements are made is important in assessing whether they evidence a legal partnership. *See Ingram*, 288 S.W.3d at 900. Indeed, there was undisputed evidence at trial that business people often use the words "partner" and "partnered" to mean any sort of close business relationship, and not strictly to mean legal partnerships. Alardin himself testified that he has used the word "partner" to describe a good business relationship that had nothing to do with a legal partnership. He also acknowledged that he was aware of other people also using the word "partner" when no legal partnership existed. Alardin used the term "partner" to describe transactions in which no legal partnership existed.

■ Moreover, "[m]ere legal conclusions by a lay witness ... do not prove the existence of a partnership or joint venture." *Ben Fitzgerald Realty Co. v. Muller*, 846 S.W.2d 110, 121 (Tex.App.-Tyler 1993, writ denied); *see also Torres v. Kelley*, No. 13–04–313–CV, 2007 WL 528849, at *3 (Tex.App.-Corpus Christi Feb. 22, 2007, no pet.) (mem. op.) (holding that conclusory statements about the existence of a partnership "are no evidence of a partnership agreement").

We conclude that Alardin's testimony that he and Hoss "specifically agree[d] to be partners" is conclusory and thus no evidence of an expression of intent to be partners in a partnership under the TRPA. *See Ben Fitzgerald Realty Co.,* 846 S.W.2d at 121. We also reject Alardin's contention that Hoss's trial testimony describing his relationship with Alardin as "partnering" with him constitutes evidence that he expressed an intent to form a legal partnership with Alardin at the relevant time several years earlier. Nothing in Hoss's testimony indicates that he expressed an intention to be Alardin's partner at the time the alleged partnership was formed.

Alardin also directs us to his own testimony that he sometimes took customers to Hoss's office and introduced Hoss as his "partner," and that Hoss never corrected him for referring to him that way. Alardin adduced specific testimony in this vein from a third-party witness named Joseph Marchese, who testified by video deposition that Alardin introduced Hoss to him as Alardin's "partner." But Marchese also testified that he did not know whether Hoss heard Alardin say that Alardin was Hoss's partner, which means his testimony about Alardin's introduction does not prove any sort of "adoptive admission" by Hoss. And there was no evidence that using the word "partner" in the context of customer introductions like Alardin described would ordinarily be understood to have legal significance. Thus, we conclude that Alardin's evidence that he introduced Hoss to customers as his "partner," absent evidence to explain why the context of those introductions showed that the term carried legal significance, is no evidence of the second TRPA factor.

Finally, Alardin testified that he specifically referred to Hoss as his "partner" at a meeting of the personnel involved in the SiteWatch project. His testimony was not specific, but this meeting apparently took place in or about August 2004. It is not clear from Alardin's testimony whether Hoss was present at the meeting, but Alardin did testify that Hoss never disputed that Alardin referred to him as his partner at the meeting. Whether Hoss was present or not, there is no evidence that this context—a meeting of Alardin with the HEC employees who were helping with the SiteWatch project—was one in which Alardin's audience would have understood him to be making a statement of legal significance regarding his business relationship with Hoss. Thus, Alardin's testimony about the 2004 meeting is no evidence of the second TRPA factor.

For the foregoing reasons, we conclude that Alardin adduced no evidence of the second TRPA factor.

### c. Control

■ The third TRPA factor is participation in or the right to participate in the control of the business. TRPA art. 6132b–2.03(a)(3). "The right to control a business is the right to make executive decisions." *Ingram,* 288 S.W.3d at 901. Texas courts have held that various facts can be relevant to this factor, such as exercising authority over the business's operations, the right to write checks on the business's checking account, control over and access to the business's books, and receiving and managing all of the business's assets and monies. *Id.* at 901–02 (citing cases).

■ Although Alardin obviously participated in the work to advance the SiteWatch project, Alardin cites no evidence showing that he exercised authority over the business's operations or made any of its executive decisions. He cites only evidence tending to show that he directed the HEC employees that Hoss assigned to the SiteWatch project. He testified as follows:

Q. In that regard, did Gregg have or did he agree to have the ability in this agreement that he could tell you what to do or y'all could each—each of you could direct the employees in this project?

A. Yes, sir.

Q. What was your mind-set at that time in terms of sort of following Gregg, whatever he thought was best, what y'all were going to do, what were you thinking in that regard?

A. Well, if Gregg said jump, I would jump. I mean, that's just the way it was. And I was the point man in essence over the project itself, but he had final decision as far as, you know, if he wanted something done or not done, that's the way it was.

Q. And why was that the way it was?

A. Respect. He was—he had—he was the money man, he had earned, you know, he had—he had experience, his business experience, business acumen.

Alardin's testimony also showed that he had to account to Hoss for the business's finances and that Hoss ultimately made the financial decisions relating to the venture:

Q. So when you had a list of bills that had to get paid, what did you do as a practical matter, what did you do with that?

A. Usually I will see Gregg on the yard and tell him or write a note about different things that we needed, places that we needed to go, bills that needed to be paid, and it would usually add up to lot more than what I would get, quite candidly, because he was going through some financial difficulties, or his company was at that time, and he would say, okay, well, what do we really have

to pay right now? And then that's what I would have to submit an invoice for.

The evidence of control in this case is comparable to that in *Knowles v. Wright*, 288 S.W.3d 136 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). In that case, Knowles claimed that he and Wright had formed a partnership, but he acknowledged that he had no "signatory authority" for the partnership and that he did not have any authority to override Wright's decisions. *Id.* at 147. Although Knowles testified that he and Wright made decisions together, his testimony made it clear that "he had no control over the purported partnership and that Wright retained ultimate control over business decisions." *Id.* In this case, Alardin adduced no evidence that he participated in the control of the business or had any right of control except to direct the HEC employees that Hoss assigned to the SiteWatch project. And he acknowledged that Hoss had the ultimate power to decide whether anything was done or not done on the project.

Alardin adduced no evidence of the third TRPA factor.

#### d. Sharing of losses and liabilities

■ With respect to the fourth TRPA factor, the jury was asked whether the parties shared or agreed to share the "losses and liabilities of the business." This is slightly different from the actual language of the TRPA, which refers to losses *or* liabilities of the business. *See* TRPA art. 6132b–2.03(a)(4). In the absence of a relevant objection to the jury charge, we evaluate the sufficiency of the evidence based on the charge and instructions that were submitted to the jury. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *EMC Mortg. Corp. v. Jones*, 252 S.W.3d 857, 869 (Tex.App.-Dallas 2008, no

pet.). Thus, under the jury charge, the fourth factor required Alardin to adduce evidence that he and Hoss shared or agreed to share in both the losses and the liabilities of the business. We note that an agreement to share losses is not necessary to create a partnership under the TRPA, but the existence of such an agreement supports the existence of a partnership. TRPA art. 6132b–2.03(c); *Ingram*, 288 S.W.3d at 902.

As to this factor, Alardin cites only his own testimony, as follows:

> Q. What kind—how were y'all going to work that in terms of how y'all were going to split profits?
>
> A. We were going to split profits 50–50.
>
> Q. Liabilities as well?
>
> A. Yes.

Even assuming Alardin's testimony amounts to some evidence that he and Hoss agreed to share liabilities, it constitutes no evidence that he and Hoss shared or agreed to share in the business's losses, as required by the jury charge.

We conclude that Alardin adduced no evidence of the fourth TRPA factor as that factor was submitted to the jury.

### e. Contribution of money or property

The last TRPA factor is whether the alleged partners contributed or agreed to contribute money or property to the business. TRPA art. 6132b–2.03(a)(5). The TRPA defines "property" as "all property, real, personal, or mixed, tangible or intangible, or an interest in that property." *Id.* art. 6132b–1.01(15). Hoss points out that the TRPA provides that the right to receive a share of profits as repayment of a debt, "by itself, does not indicate that a person is a partner in the business." *Id.* art. 6132b–2.03(b)(1)(A). Thus, he argues, the jury's findings that Alardin, RMT, and

SiteWatch LLC owed him money on various loans shows that those loans were not contributions to the alleged partnership. But we have held that loans of money can constitute contributions to the business under the TRPA, *Reagan*, 156 S.W.3d at 928; the TRPA provides only that right to repayment of a debt "by itself" does not indicate a partnership relationship, TRPA art. 6132b–2.03(b)(1)(A). Hoss contends that there is no evidence that he otherwise contributed money or property to the business of the alleged partnership.

Alardin argues that Hoss agreed to contribute to the venture in a variety of ways. He contends that Hoss agreed to contribute financing, business management, credit, mentoring, and the resources of his business, HEC. He also argues that Hoss contributed a "light plant" to the alleged partnership. Specifically, he testified as follows:

> And on 9–14[–2001] I went to Gregg [Hoss] and we discussed this. And he at that point in time—that's when he bought in. That's when he said, you know, he could see this being something that we could do something with. And that's when we began—he—he made that initial investment of the $25,000 that we built the first system with. He donated a light plant.

It is not clear from the record what this "light plant" was, but the context of the evidence suggests that it was a piece of equipment that was used as part of a prototype surveillance system that was taken to construction trade shows. Alardin's testimony about the light plant constitutes some evidence that Hoss contributed property to the business.

The other evidence relied on by Alardin does not support this factor. Although Hoss testified that he "agreed to help [Alardin] with the credit situation," helping someone obtain credit from a third party is

not a contribution of money or property. Alardin testified that Hoss allowed him to use HEC facilities and personnel and, more generally, that HEC "was his arm, so to speak, that he would help further the partnership with." But evidence of contributions of facilities, personnel, or materials by HEC is no evidence of contributions by Hoss individually.

Although the evidence shows Hoss made loans toward the project and contributed a light plant to the project, Hoss also points out that Alardin cites no evidence that Alardin contributed or agreed to contribute money or property to the project. We have reviewed the record and found only abbreviated statements by Alardin that arguably touch on the subject. At one point, Alardin testified as follows:

A: We basically ran a lot of things on my—on our AMEX credit cards, or on my own credit card a lot of times, too.

Later, Alardin testified as follows:

Q: In January of '04, the [partnership's] revenues were $58,000, is that right?

A: Something like that, yes, sir.

Q: What were the profits in '04?

A: They weren't—they were negligible. There wasn't any because I was having to actually put my own money in.

And he also testified as follows:

Q: There was a fair amount of research and development that went into this camera project from September of 2001 until the falling out in March of 2005?

A: There was, absolutely.

Q: And Mr. Hoss paid for that R & D?

A: I paid for some, too, but, yes, he did.

■ Evidence that business expenses were paid by a credit card, in and of itself, is not evidence that money or property was contributed as capital to the business. Alardin's testimony about the use of credit cards and the payment of research and development expenses is not, therefore, evidence of contributions to the business. And Alardin's statement that he had to put his own money in the business is no more than a scintilla of evidence that he contributed capital to the business. Because Alardin adduced no evidence that he contributed or agreed to contribute money or property to the project, we conclude there is no evidence to satisfy the fifth TRPA factor.

### 4. Sufficiency analysis

We have concluded that the record contains no evidence of four of the five TRPA factors. There was some evidence, albeit weak and self-contradictory, that Hoss and Alardin agreed to share profits. There was no evidence that the parties actually shared any profits, no evidence that they expressed an intent to be partners, no evidence that Alardin controlled or possessed a right to control the business, no evidence that the parties agreed to share losses and liabilities, as the jury charge required, and no evidence that Alardin contributed or agreed to contribute money or property to the venture. The TRPA comments note that the sharing of profits and control over the business will probably continue to be the most important factors in determining whether a partnership exists. TRPA art. 6132b–2.03 cmt. As we have described, there is no evidence of a sharing of control and only weak and self-contradictory evidence of an agreement to share profits.

In *Ingram,* the supreme court opined that an absence of evidence as to all five factors will preclude the recognition of a partnership, and that even conclusive evi-

dence of only one factor will normally be insufficient to establish the existence of a partnership. *Ingram*, 288 S.W.3d at 898. In the instant case, Alardin did not put on conclusive evidence of any of the TRPA factors. He put on only weak evidence, much of its contradicted by his own testimony, of one TRPA factor. This alone is sufficient to compel the conclusion that the evidence supporting the jury's finding of a partnership is less than a scintilla of evidence.

■ Moreover, Alardin's claim of the existence of a partnership was contradicted by evidence that we conclude the jury could not reasonably disregard. *See Wilson*, 168 S.W.3d at 827 (courts must "disregard contrary evidence unless reasonable jurors could not"); *see also id.* at 820 ("Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted."). Under the TRPA, a partnership is an entity distinct from its partners. TRPA art. 6132b–2.01. Yet, Alardin testified that the alleged partnership, which he contended existed for several years, never filed a federal or state partnership tax return. He testified that it never applied for its own federal tax identification number and never issued K–1 tax forms to the alleged partners. He even testified that the alleged partnership did not have a name.[6] And there is no evidence that anyone—Alardin included—ever treated the alleged partnership as a distinct entity independent of the people and companies that participated in the SiteWatch development project.

We also conclude that the jury could not reasonably disregard Alardin's pre-litigation written account of the history of the SiteWatch project, which was admitted at trial in redacted form. He created this document in April 2005—shortly after he was locked out of the HEC facility where the project was housed, and several months before Hoss sued him. He entitled the document "SiteWatch LLC dba SiteWatch Systems," which was his own company, and not "SiteWatch partnership." In the document, Alardin did not refer to a partnership at all, with Hoss or anyone else. Rather, he described the beginning of the parties' business relationship as follows:

> On September 14, 2001[,] Gregg M. Hoss of Hoss Equipment Company loaned Remote Monitoring Technologies $25,000 for research and development. Gregg Hoss asked for and was promised that in exchange for mentoring, credit and financial considerations, and use of the Hoss Equipment facilities, personnel and assets; he would receive repayment of notes, reimbursement of parts and verifiable shop costs, agree to mutual non-compete, and receive an exclusive sales and marketing agreement with RMT for SiteWatch System technology within his industry—Construction and Mining.

Thus, in Alardin's own pre-litigation recitation of his understanding with Hoss, he mentioned nothing about an agreement with Hoss to be partners, about mutual control of the enterprise, or about the sharing of profits, losses, or liabilities. Instead, he indicated that Hoss's only interest in the project lay in repayment of loans and expenses, plus a marketing agreement regarding SiteWatch technology. None of this is consistent with a partnership involving Hoss and Alardin as individuals but, rather, is consistent with other evidence showing a partnership was never formed.

### 5. Conclusion

---

6. Alardin said he "felt like we called it the SiteWatch project partnership."

Alardin adduced no evidence of four of the five TRPA factors. He adduced only weak evidence relating to a single TRPA factor, an agreement to share profits. Undisputed evidence, including many admissions by Alardin himself, proved many facts that were inconsistent with the proposition that he and Hoss formed a partnership. Under the totality-of-the-circumstances test prescribed by *Ingram*, 288 S.W.3d at 898, we conclude that the evidence of a partnership is less than a scintilla, and thus is legally insufficient to support the jury's finding of a partnership.

Our conclusion that the jury's finding of a partnership between Hoss and Alardin was supported by legally insufficient evidence negates the predicate for Alardin's recovery for breach of fiduciary duty, so we need not consider Hoss's remaining issues on appeal.

### III. Appellees' Cross-Appeal

We next consider the three issues appellees assert in their cross-appeal. They contend (1) the evidence is legally and factually insufficient to support the jury's finding that appellees owed Hoss money, (2) the evidence is legally and factually insufficient to support the award of attorneys' fees to Hoss, and (3) the trial court erred by rendering a take-nothing summary judgment on appellees' breach-of-contract claim.

### A. Hoss's breach-of-contract claim

The jury found that each appellee agreed to repay monies advanced by Hoss. As to each of those three parties, Question No. 9 asked, "What sum of money, if any, is now due and owing ... to Gregg Hoss?" The jury found that Alardin owed Hoss $117,481, RMT owed Hoss $27,998, and SiteWatch LLC owed Hoss $36,631. The judge rendered judgment against appellees in those amounts. In their first issue on cross-appeal, appellees argue that the evidence is legally and factually insufficient to support the jury's findings that these sums were due and owing. We disagree.

■ "A party breaches a contract by failing to perform when that party's performance is due." *E.P. Towne Ctr. Partners, L.P. v. Chopsticks, Inc.*, 242 S.W.3d 117, 123 (Tex.App.-El Paso 2007, no pet.); *see also Orix Capital Mkts., L.L.C. v. Wash. Mut. Bank*, 260 S.W.3d 620, 623 (Tex.App.-Dallas 2008, no pet.) ("A breach of contract occurs when a party fails or refuses to perform an act that it expressly promised to do."). Appellees concede there is conflicting evidence as to whether they agreed to repay monies to Hoss, but they contend there is no evidence that their alleged obligations to pay ever came due. They contend further that the only evidence in the record conclusively proves that their alleged obligations to pay never came due. Hoss contends there is sufficient evidence that appellees' debts to him were due.

Appellees argue that Hoss's own testimony establishes that they were not obligated to repay his contributions until the SiteWatch project became profitable. They rely specifically on the following testimony by Hoss:

Q: And you've talked about and you've told us that you think the terms of the loans were that Tony needed to pay that back when the SiteWatch product took off and made a profit, right?

A: And, again, I'm not trying to be contentious, but as far as the loans that I personally made?

Q: Uh-huh, yes, sir.

A: Yes, that was correct. Angela's original loans were completely different.

...

Q: Your particular loans you said—if I understand your version of how it's going—is that, Tony, you need to pay this back when you make it, right?

A: Correct.

Q: I don't want to put too fine a point on it, Mr. Hoss, but isn't it just logical if we're being here even under your version—and I'm trying to talk on your side of things and how you think it is now—that the truth is even if they were loans under the terms that you just said under your opinion, he hasn't made it, so really they're not due to him to pay back yet, right? That's the truth, isn't it?

A: That's the truth, yes, sir.

Appellees construe this testimony to mean that Hoss's loans to them would not come due until the SiteWatch project became profitable, and that in Hoss's own opinion that event never came to pass.

Hoss responds that there was some evidence to support the jury's finding that appellees' debts to him were due and owing. First, he relies on his own testimony that Alardin agreed to pay back each loan Hoss made and that Alardin did not do so. We agree that this is some evidence that the loans were due and owing. Ordinarily a lender does not state that a borrower did not repay him unless the obligation is already due and owing. Hoss also points out that Alardin himself testified that the SiteWatch project did generate some profits, which were reinvested in the company and thus not used to repay Hoss. The jury could reasonably have concluded from this evidence that, despite Hoss's testimony that Alardin had not "made it," the project did reach some level of profitability, thereby triggering appellees' obligation to pay Hoss back.

We conclude that the evidence was legally and factually sufficient to support the jury's finding that appellees' loans from Hoss were due and owing. Accordingly, we reject appellees' first issue on their cross-appeal.

## B. Attorneys' fees

The jury awarded Hoss his attorneys' fees in the amounts of $500,000 for preparation and trial, $100,000 for an appeal to the court of appeals, and $50,000 for an appeal to the Texas Supreme Court. The jury specified those amounts in answer to Question No. 14, which asked, "What is a reasonable fee for the necessary services of Gregg Hoss's attorneys in regard for [sic] the claim of breach of agreement found by you in answer to Question 7?" The judge rendered judgment against appellees in those amounts, specifying that Hoss could recover the appellate fee awards only if he prevailed on appeal. Appellees contend that the evidence is legally and factually insufficient to support the fee awards because Hoss did not adduce evidence segregating his recoverable attorneys' fees from fee expenditures that were not recoverable.

We have already set forth the standard of review for legal sufficiency of the evidence. When an appellant attacks the factual sufficiency of the evidence to support an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that there is insufficient evidence to support the adverse finding. *Hani v. Jimenez*, 264 S.W.3d 881, 886 (Tex.App.-Dallas 2008, pet. denied). In a factual-sufficiency challenge, we consider all the evidence and set the verdict aside only if the evidence supporting the jury finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust.

*State Farm Lloyds v. Hamilton,* 265 S.W.3d 725, 729 (Tex.App.-Dallas 2008, pet. dism'd).

 If a claimant is entitled to recover attorneys' fees for some but not all of his claims, he bears the burden of segregating his fees between claims for which they are recoverable and claims for which they are not. *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 311 (Tex.2006); *A & L Eng'g & Consulting, Inc. v. Shiloh Apollo Plaza, Inc.,* 315 S.W.3d 928, 931 (Tex.App.-Dallas 2010, no pet.). "Segregation is not necessary, however, where the claims are 'inextricably intertwined.'" *Cooper v. Cochran,* 288 S.W.3d 522, 536 (Tex.App.-Dallas 2009, no pet.) (citing *Tony Gullo Motors,* 212 S.W.3d at 312). If legal services are incurred to prosecute a claim for which fees are recoverable, the resulting fees are recoverable even if the services also support claims for which fees are not recoverable. *Tony Gullo Motors,* 212 S.W.3d at 313; *Cooper,* 288 S.W.3d at 537.

Because Hoss prevailed on his breach-of-contract claim, he was entitled to recover his reasonable attorneys' fees incurred in the prosecution of that claim. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001 (West 2008). And the jury question limited the jury's consideration to Hoss's fees incurred in connection with his breach-of-contract claims against appellees. Appellees contend that Hoss's evidence of fees, however, failed to distinguish between fees incurred to prosecute those particular claims and fees incurred in connection with other claims for which fees were not recoverable. In particular, appellees point out that Hoss's evidence showed that the $500,000 in fees incurred before trial were incurred not only to prosecute Hoss's breach-of-contract claims, but also to provide representation for parties Angela Hoss, HEC, another company called Hoss Equipment

Company Nevada, and Nyle Brasch. Angela Hoss prosecuted claims for breach of contract and for assault, and she did not prevail on those claims. Brasch prosecuted a fiduciary-duty claim against Alardin, and he did not prevail on that claim. HEC did not prevail on its breach-of-contract claim, and Hoss Equipment Company Nevada did not even submit any claims to the jury. Because of these failures of proof, appellees contend, the award of attorneys' fees to Hoss is supported by insufficient evidence. We agree with appellees.

 Hoss contends that the parties' various claims were so intertwined that he was not required to segregate his fees. He also contends that his defense of Alardin's partnership counterclaim was necessary for him to prevail on his breach-of-contract claims because Alardin argued that Hoss's contributions to the project were capital contributions and not loans. He also asserts that all the claims in this case involved the same set of facts. Hoss's arguments are not persuasive. "Intertwined facts do not make [unrecoverable] fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Tony Gullo Motors,* 212 S.W.3d at 313–14. Thus, fees incurred for the drafting of pleadings and jury-charge materials that related to tort claims or unsuccessful contract claims by other claimants were not recoverable. *See id.* at 313; *see also Allan v. Nersesova,* 307 S.W.3d 564, 573 (Tex.App.-Dallas 2010, no pet.) ("[F]ees incurred in drafting the original and amended petitions and the jury charge relating to the tort claims were not recoverable, while the portion of the fees relating to the contract claim was recoverable."). Hoss points to no evidence showing that the fees incurred in prosecution of the numerous unsuccessful claims brought by

Angela Hoss, Brasch, and others also advanced the prosecution of his successful contract claims.

■ Alternatively, Hoss argues that appellees failed to carry their burden to show that segregation was necessary and possible. We agree with appellees that Hoss misplaces the burden of proof. "Generally, the party seeking to recover attorney's fees carries the burden of proof." *A & L Eng'g*, 315 S.W.3d at 931. "If attorney's fees are authorized for some, but not all, of a party's claims, that party generally has the duty to segregate the recoverable from the non-recoverable attorney's fees." *Id.* In this case, Hoss adduced unsegregated evidence of the total fees his attorneys incurred in representing him and all the other parties on his side of the case. We conclude that those legal services necessarily involved some services that did not advance Hoss's breach-of-contract claims, such as work done on Angela Hoss's assault claim against Alardin, and work done on Brasch's partnership claim against Alardin. Thus, Hoss's evidence of fees did not support any particular amount of fees that was properly recoverable from appellees.

Hoss relies on the case of *Cooper v. Cochran* in support of his theory that appellees bore the burden of proof on the segregation issue. We conclude that *Cooper* is distinguishable. In that case, Cooper argued that appellees had failed to segregate their fees, but he failed to point to any instances of legal services for which segregation would be appropriate. *Id.* at 537. Because the legal services for appellees' claims and defenses appeared to be intertwined, we rejected Cooper's argument. *Id.* We read *Cooper* to mean only that Cooper failed to carry his burden of briefing on appeal by failing to point out why appellees' evidence of unsegregated

fees was insufficient. In this case, appellees have provided specific reasons Hoss was obliged to segregate his fees—his attorneys represented multiple parties on multiple claims, some of which carried no right to fees and most of which failed at trial. At least some of the work on those claims—such as work on Angela Hoss's assault and breach-of-contract claims—would not support the claims on which Hoss did recover. Accordingly, we conclude that appellees adequately briefed this issue and have demonstrated that Hoss's evidence of the unsegregated amount of attorneys' fees incurred by his attorneys in this case provides an inadequate evidentiary basis for the jury's finding of his reasonable and necessary attorneys' fees incurred in the prosecution of his successful breach-of-contract claims.

■ "Unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be." *Tony Gullo Motors*, 212 S.W.3d at 314. Accordingly, an award of attorneys' fees that is improperly based on evidence of unsegregated fees must be remanded for further proceedings on the issue. *Id.; A & L Eng'g*, 315 S.W.3d at 931–32; *Allan*, 307 S.W.3d at 573–74. We sustain appellees' second issue on their cross-appeal.

## C. Summary judgment

Appellees Alardin, SiteWatch LLC, and RMT each pleaded a claim against Hoss for breach of contract, specifically breach of an oral partnership agreement. Hoss sought and obtained summary judgment on these breach-of-contract claims on traditional and no-evidence grounds, contending that the evidence disproved the essential element of damages and that appellees could produce no evidence of damages. In their third issue on cross-appeal, appellees

challenge the summary judgment.[7]

We review a summary judgment de novo. *Smith v. Deneve*, 285 S.W.3d 904, 909 (Tex.App.-Dallas 2009, no pet.). When we review a traditional summary judgment in favor of a defendant, we determine whether the defendant conclusively disproved an element of the plaintiff's claim or conclusively proved every element of an affirmative defense. *Id.* When we review a no-evidence summary judgment, we inquire whether the nonmovant adduced sufficient evidence to raise a genuine issue of fact on the challenged elements. *Id.*

Some additional background is necessary to put appellees' argument in context. After Alardin and Hoss had their falling out in early 2005, HEC formed an internal division called Hoss On–Site Solutions (HOSS) to handle the sale of products that were allegedly similar to those involved in the SiteWatch project. According to appellees, evidence that HOSS was profitable is sufficient to defeat summary judgment, because evidence that HOSS was profitable would also be evidence that appellees suffered lost-profits damages caused by Hoss's alleged breach of the alleged partnership agreement. In their appellate brief, appellees rely specifically on two pages of summary-judgment evidence to raise a fact issue whether HOSS was profitable. One page purports to be a profit-and-loss statement for HOSS for the year ended December 31, 2005. It reflects a gross margin of $92,268.85 and reflects zero deductions for overhead such as advertising, rent, and salaries. The other page purports to be a profit-and-loss statement for HOSS for the year ended December 31, 2006. It reflects a gross margin of

$277,027.97, but it also contains figures for various items of overhead, leading to a statement of a net loss of over $308,000.

 We conclude that the evidence cited by appellees does not raise a genuine fact issue on the element of damages. The proper measure of lost-profits damages is lost net profits, not lost gross profits. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 n. 1 (Tex.1992); *Texaco, Inc. v. Phan*, 137 S.W.3d 763, 771 (Tex.App.-Houston [1st Dist.] 2004, no pet.). "Net profit" is defined as the difference between a business's total receipts and all of the expenses incurred in carrying on the business. *Texaco, Inc.*, 137 S.W.3d at 771; *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex.App.-Dallas 1988), *writ denied*, 778 S.W.2d 865 (Tex.1989) (per curiam). Gross profit, by contrast, is the difference between a business's receipts and the cost of goods sold, without adjusting for additional expenses and taxes. Black's Law Dictionary 1246 (8th ed. 2004); *see also Adkins Adjustment Servs., Inc. v. Neal*, No. 05–00–01419–CV, 2001 WL 1231685, at *1 (Tex.App.-Dallas Oct. 17, 2001, no pet.) (not designated for publication) (describing "gross profit" as "revenues less variable costs incurring in generating that revenue").

Appellees' summary-judgment evidence shows, at most, that HOSS earned gross profits in the years 2005 and 2006. Neither page of evidence relied on by appellees shows that HOSS earned any net profits. The 2005 statement reports only HOSS's gross profits, without accounting for overhead; this is no evidence of HOSS's net profits. *See Wiese v. Pro Am*

---

7. Our conclusion that Alardin failed to prove the existence of a partnership at trial arguably makes any error in the trial court's summary-judgment disposition of his breach-of-contract claim harmless. But even if this were the case, we must address the summary judgment on the merits as to the separate breach-of-contract claims asserted by SiteWatch LLC and RMT. Because we affirm the summary judgment on grounds equally applicable to all three appellees, we do not consider the possible harmless-error point.

*Servs., Inc.,* 317 S.W.3d 857, 863–64 & n. 4 (Tex.App.-Houston [14th Dist.] 2010, no pet.) (evidence of lost revenues without deducting "normal business operating expenses" was no evidence of lost profits); *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.,* 131 S.W.3d 203, 209 (Tex. App.-Fort Worth 2004, pet. denied) (evidence of lost gross profits constituted no evidence of damages). Although appellees argue that HOSS's statement of a net loss for 2006 instead of a net profit results from "creative accounting," they adduced no evidence showing that HOSS actually made a net profit in 2006 or in any other time frame.

We reject appellees' third issue on their cross-appeal.

## IV. DISPOSITION

We reverse the judgment in favor of Alardin and render judgment that he take nothing. We reverse the award of attorneys' fees to Hoss and remand for further proceedings on that issue alone. In all other respects, we affirm the judgment of the trial court.