Opinion issued March 8, 2012.



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00936-CV

———————————

R. Scott Brown, Appellant

V.

Allan D.
Keel, Appellee



 



 

On Appeal from the 234th District Court

Harris County, Texas



Trial Court Case No. 2009-04679

 



 

MEMORANDUM OPINION

R. Scott
Brown appeals from the trial court’s judgment notwithstanding the verdict
(JNOV) in this partnership dispute. In his first and second issues, Brown
contends that the trial court erred in granting JNOV in favor of Allan Keel
because there was sufficient evidence to support the jury’s findings on the
existence of a partnership and causation. In his third, fourth and fifth
issues, Brown challenges the trial court’s alternative JNOV reducing the
damages award and failure to grant Brown’s JNOV to increase the damages award.
We hold that the evidence is legally sufficient to support the jury’s
partnership finding but not legally sufficient to support the finding on
causation. We therefore affirm the trial court’s judgment.

Background

A.      The transaction

In 2004, Brown and Keel began
discussing the possibility of starting their own private equity fund with a
focus on oil and gas investments. Brown brought finance experience to the
endeavor, while Keel brought operational experience in the energy sector. They
dubbed their venture “Maverick Energy” and traveled to New York to pitch their
fund to potential investors. The New York trip did not bear fruit, but shortly
after they returned to Houston, Brown contacted Keel about an investment
opportunity involving GulfWest Energy, a Houston-based oil and gas company.
GulfWest suffered cash-flow problems in 2004 and was looking for investors to
provide the cash-infusion needed to get the company back on track. Maverick
entered into a confidentiality agreement with GulfWest so that Brown and Keel
could obtain the information necessary to perform due diligence on a potential
investment in GulfWest.

After discovering that the name
Maverick Energy was already in use, Brown and Keel formed a Texas limited
liability company under the name Volant Energy.[1] The following day, Volant
sent GulfWest an acquisition proposal for a cash purchase of GulfWest’s shares.
Brown and Keel then began looking for an investor to finance the transaction.
As part of this effort, Keel contacted Oaktree Capital Management, a California
private investment fund. 

Keel and Brown began discussions
with Oaktree about the GulfWest investment opportunity in late-November. In
early-December, Keel sent Oaktree a proposed term sheet. The term sheet
provided for $75 million in initial funding from investors, which would be used
to purchase GulfWest’s outstanding shares, converting GulfWest from
publicallyowned to privatelyowned. Under the term sheet, Keel and Brown were
identified as “Management,” who would provide $300,000 in initial funding, be
retained by the new company under five-year employment contracts, and receive
a  1% transaction fee at closing as well
as considerable equity and options in the new entity. Under their proposal,
Brown would be CFO of the new company and Keel would be CEO.

Oaktree was interested in the
investment but not under the terms proposed by Brown and Keel. Instead of
investing $75 million to purchase all of GulfWest’s shares and take the company
private, Oaktree decided to leave GulfWest public and invest $40 million to
acquire a majority interest. Oaktree decided to use its own investment vehicle
for the transaction, rather than Volant. Oaktree rejected Brown and Keel’s 1%
transaction fee and instead suggested a $600,000 transaction fee at closing to
be invested in new preferred shares of GulfWest. Oaktree also resisted paying
an investment banking fee to Brown’s employer, Southwest Securities, arguing
that Southwest had not been involved in the deal other than as Brown’s employer
when he worked on the deal; Oaktree suggested any payment to Southwest should
come out of Brown and Keel’s transaction fee. Oaktree altered the terms of
Brown and Keel’s anticipated employment contracts, including a reduced salary,
reduced bonuses and a shortened three-year term. Oaktree also wanted to give
Brown and Keel less equity and no options. In mid- and late-December, Keel sent
Oaktree revised term sheets from Volant containing most of the terms dictated
by Oaktree.

Beginning in December 2004, friction
arose between Brown, who took the lead in negotiations with Oaktree on behalf
of Brown and Keel, and Skardon Baker, Oaktree’s point man in the negotiations.
Baker was displeased with Brown’s negotiation style and demeanor. Baker also
expressed concern that Brown had never served as CFO of a publicly traded
company. Baker began to communicate primarily with Keel, leaving Brown off
emails about the transaction. Keel also began sending email to Baker and others
at Oaktree that did not include Brown, although on at least one occasion, Keel
forwarded one of Baker’s emails about the transaction to Brown. Ultimately,
Baker concluded that Oaktree should not hire Brown as CFO of the new company. 

On January 9, Baker sent an email
to Keel and others stating that he had spoken with Jim Ford, managing director
of Oaktree, about the “CFO issue” and Jim was “on board with the necessary
action.” Baker suggested that Oaktree involve “Julien,” Oaktree’s lawyer, “so
we are doing it in a professional and safe manner.”  Keel did not disclose his discussions with
Oaktree to Brown. At the same time, GulfWest’s cash flow problems posed a
hindrance to the transaction. GulfWest did not have funds to cover the
necessary due diligence costs. After Oaktree refused, Brown and Keel loaned
GulfWest $200,000—$120,000
from Keel and $80,000 from Brown—to cover these costs. This loan took place on January 10—the day after Keel received Baker’s email about
not hiring Brown.

Throughout January, Keel did not
disclose Oaktree’s intentions to Brown, but he did encourage Oaktree to handle
the matter itself. In one email between Keel and Oaktree, Keel states:

Scott senses there is something amiss and as soon as
we can get comfortable that the deal will happen I think we/you should speak
with him. He has worked very hard and even though I believe he ultimately could
be a productive CFO, I understand your issues. It is important to me that
Southwest receive a fair fee for their part in this transaction . . .  I don’t know if there is a way to compensate
Scott separately but he should share in his part of the transaction fee we
agreed to if possible.

 

During
this time, Oaktree and GulfWest moved forward with the transaction. 

On January 30, 2005, Ford
informed Brown that Oaktreewould not hire him as CFO of the new company, but
Ford left open the possibility that Brown could take on another role with the
company. Over the following week, Ford, Baker, and Keel had discussions
regarding a role for Brown other than CFO. Keel’s position in these discussions
was that it would be “tough to find a spot” for Brown other than CFO. Keel
stated, “Although I do believe Scott is a capable and creative professional,
I’m having difficulties seeing his role if it’s not that of CFO.” Keel noted
that the person hired as CFO would want an ownership interest and that interest
should come out of the stock options that would have gone to Brown. Oaktree
decided not to hire Brown in any role. On February 7, Keel met Brown for
lunch and “let him know there is no spot for him at new company[.]” Brown was
upset by this decision, and he made it clear he still felt that Southwest was
entitled to an investment banking fee based on his work on the transaction and
that he should be compensated individually for bringing the opportunity to
Oaktree. 

Oaktree determined that it needed a waiver from Brown,
releasing Oaktree from any liability, before it closed the GulfWest
transaction. In exchange for a release, Oaktree offered Brown his choice of
$500,000 or $250,000 plus 250,000 common shares of the new entity at closing,
which Brown was to share with SouthWest at his “discretion.” Brown rejected
this offer, noting that the “three advisory firms were each already receiving
$500,000 fees.” 

When Brown refused to sign the release, Baker contacted
Brown’s boss at Southwest. In an email following Baker’s initial communications
with Brown’s boss, Baker told Brown’s boss that Brown “has pressured us to
arrange additional compensation for him in an individual capacity” and that
Oaktree was “highly uncomfortable with that outcome” for “all the reasons we
discussed.” Oaktree offered Southwest a $500,000 investment banking fee in
exchange for signing a release and agreeing to indemnify Oaktree for any claims
against it by Brown, unless Southwest could get Brown to sign the release as
well. Brown refused to sign the release. Southwest accepted the $500,000 fee
but required Oaktree to indemnify Southwest for any claims related to the
transaction. Southwest then fired Brown.

The GulfWest transaction closed at the end of February 2005.

B.      The lawsuit

          Brown
sued Keel for breach of his partnership duties.[2] After a four-day trial, the
jury found that Keel and Brown had entered into a partnership to identify and
invest or acquire oil and gas companies and that Keel failed to comply with his
duty of loyalty to Brown. The jury found that Keel’s breach proximately caused
Brown damages of $1,250,000, based on “the value of the stock options on February
28, 2005 that Brown would have received but for the breach.” Finally, the jury
rejected Keel’s contention that Brown ratified his conduct.

Keel moved for JNOV and to
disregard the jury’s damages finding. Keel argued that the trial court should
enter JNOV because there was no evidence of a partnership or that Keel’s
alleged breach proximately caused Brown’s damages. Keel also argued that the
trial court should disregard the jury’s damages finding because it valued Brown’s lost stock options on the
date of closing, when the law required the stock options to be valued “on the
first day (after the breach) when the owner can take delivery of the stock.”
Valuing the stock options on the correct date, Keel asserted, Brown’s damages
were no more than $111,375. 

Brown moved for JNOV on damages,
arguing that the evidence conclusively established that the value of the stock
options was $7.3 million. 

The trial court denied Brown’s
motion for JNOV. It granted Keel’s motion for NOV as follows: 

Defendant’s
Motion for Judgment Notwithstanding the Verdict in the amount of $111.375 in
damages is GRANTED, but such ruling in rendered moot by the Court’s other
rulings below;

 

Defendant’s
Motion for Judgment Notwithstanding the Verdict regarding proximate cause is
GRANTED, but such ruling is rendered moot by the Court’s other ruling below;
and

 

Defendant’s
Motion for Judgment Notwithstanding the Verdict regarding formation of a
partnership is GRANTED. 

 

The trial court then entered a take-nothing judgment
in favor of Keel. 

Standard of Review

“We review a JNOV under a no-evidence standard, meaning we ‘credit
evidence favoring the jury verdict if reasonable jurors could, and disregard
contrary evidence unless reasonable jurors could not.’”Tanner v. Nationwide
Mut. Fire Ins. Co., 289 S.W.3d 828, 830 (Tex. 2009) (quoting Cent. Ready Mix Concrete Co. v. Islas,
228 S.W.3d 649, 651 (Tex. 2007)). Under this standard, we will uphold the
jury’s finding if it is supported by more than a scintilla of competent
evidence. Id. (citing Walmart Stores, Inc. v. Miller, 102
S.W.3d 706, 709 (Tex. 2003)). We will uphold the trial court’s JNOV, on the
other hand, if there is no evidence to support the jury’s finding on a vital
fact or if the evidence conclusively establishes the opposite of a vital fact. City of Keller v. Wilson, 168 S.W.3d
802, 810 (Tex. 2005). The ultimate test for legal sufficiency is“whether the
evidence at trial would enable reasonable and fair-minded people to reach the
verdict under review.”Id. at 827; see also Tanner, 289 S.W.3d at 830.
Thus, to merit the trial court’s JNOV and take-nothing judgment, Keel was
required to show that the evidence conclusively proved that a partnership did
not exist or that Keel’s breach of his partnership duties did not cause Brown
damages and that no reasonable jury was free to think otherwise. See Tanner, 289 S.W.3d at 830.Similarly,
for either Brown or Keel to demonstrate a right to JNOV on the jury’s damages
finding, he was required to show that the evidence conclusively proved the
value of Brown’s lost stock options under the applicable measure of damages in
the amount of the judgment sought. See
id.

Partnership Evidence

In his first issue, Brown contends
that the trial court erred in entering JNOV on the ground that there was no
evidence of a partnership. The parties agree that the determination of whether
a partnership existed between Brown and Keel is made in consideration of the
five factors identified in Ingram
v. Deere, 288 S.W.3d 886, 896
(Tex. 2009).[3] These factors are:

 (1)    receipt or right to receive a share of
profits of the business;

 

(2)     expression of intent
to be partners in the business;

 

(3)     participation
or right to participate in control of the business;

 

(4)     sharing or
agreeing to share:

 

(A) losses of the business; or

 

(B) liability for claims by third
parties against the business; and

 

(5)     contributing
or agreeing to contribute money or property to the business.

 

Id. at 895; see also Tex. Bus. Orgs. Code Ann. § 152.052(a) (West Supp. 2011). Proof of each of these elements is not necessary to
establish a partnership. Ingram, 288
SW.3dat 896. Instead, all of these factors should be considered in determining
whether a partnership exists and no single factor is determinative. Id. at 896–97. Under this
totality-of-the-circumstances test, even conclusive evidence of only one factor
normally will not be sufficient to establish the existence of a partnership. Id. at 898. On the other hand,
conclusive evidence of all five factors will establish a partnership as a
matter of law. Id.

A.      Sharing
profits 

          Shared rights to profits and to
control the business are generally considered the most important factors in
establishing the existence of a partnership. Ingram, 288 S.W.3d at 896; see
also Big Easy Cajun Corp. v. Dallas Galleria Ltd., 293 S.W.3d  345, 348 (Tex. App.—Dallas 2009, pet. denied)
(“The most important of these factors are sharing profits and participating in
control of the business.”). As evidence of profit sharing, Brown relies on his
own testimony at trial as well as certain exhibits providing for equal payments
and rights for Brown and Keel under their investment proposals. Brown testified
that he and Keel agreed to share profits and losses. He further testified that
he and Keel had agreed to a 50-50 split of both the risk of their venture and
any revenues and “upside from the investment.” The evidence at trial included a
“Maverick Energy” budget proposal from October 2004 that anticipated equal
compensation for Brown and Keel and multiple “Volant Energy” term sheets sent
to Oaktree that provided for equal compensation, employment rights, and stock
options for Brown and Keel. 

          Keel attacks Brown’s profit sharing
evidence on the grounds that some of Brown’s testimony relates to “revenues,”
rather than profits, and that payment of wages or other compensation is not
evidence of profit sharing. See Ingram,
288 S.W.3d at 899 (noting the distinction between gross revenues and profits); see also id. at 898 (noting that profits
paid as compensation for work performed is not indicative of a partnership
interest). But Brown specifically testified that he and Keel agreed to share
“profits,” not just revenues. And sharing equally in revenues can equate to sharing
in profits when expenditures are also equally shared, as Brown testified here. See id.at 899 (citing to definition of
“profits” as the “excess of revenues over expenditures in a business
transaction”). Finally, although the profit sharing evidence Brown relies on
includes proposals under which Brown and Keel would be paid equal salaries, the
evidence is not limited to salary evidence. Brown testified about “profits”
broadly, as well as investment management fees earned by the partnership entity
and increases in the value of their investment. 

          As the sole judge of the witnesses’
credibility, the jury was free to credit Brown’s testimony that he and Keel had
agreed to share profits. See City of
Keller, 168 S.W.3d at 819 (“Jurors are the sole judges of the credibility
of the witnesses and the weight to give their testimony.”); Hoss v. Alardin, 338 S.W.3d 635, 641
(Tex. App.—Dallas 2011, no pet.) (quotingCity
of Keller for this principle in context of dispute over existence of
partnership).Keel cites no evidence tending to disprove such an agreement. 

This factor provides support for the jury’s partnership
finding.

B.      Expression
of intent to be partners

When considering whether the parties expressed an intent to
be partners, courts look at the parties’ speech, writings, and conduct. Ingram,
288 S.W.3d at 899. “Evidence of intent could include, for example, the parties’
statements that they are partners, one party holding the other party out as a
partner on the business’s letterhead or name plate, or in a signed partnership
agreement.” Id. at 900. This inquiry
is “separate and apart from the other factors” and should only include evidence
not specifically probative of the other factors.Id. at 899–900. Thus, evidence of profit or loss sharing, control,
or contribution of money or property is not evidence of an expression of intent
to be partners. Id. at 900. “Otherwise,
all evidence could be an ‘expression’ of the parties intent, making the intent
factor a catch-all for evidence of any of the factors, and the separate
‘expression of intent’ inquiry would be eviscerated.” Id.

As evidence of an expression of intent to be partners, Brown
relies on his testimony that he and Keel were partners, that they “express[ed
a] mutual intent to be partners,” and that they “shook hands” on the agreement
before leaving for the New York trip in September 2004. Brown also relies on the
Maverick PowerPoint presentations Brown and Keel gave to potential investors in
New York, which identified Brown and Keel as “principals,” which Brown
understood to be short for “principal partners.” Brown also points out that he
and Keel were identified as the only two “managers” of Volant in documents
filed with the Texas Secretary of State. Finally, Brown relies on testimony in
which he disputes Keel’s testimony that they did not agree to be partners and
Keel never expressed an intent to be partners. 

A lay witness’s conclusion as to
whether a partnership has been formed is generally not competent evidence of
the formation of a partnership. See Hoss, 338 S.W.3d at 644–45 (holding that plaintiff’s testimony
that he and defendant “specifically agree[d] to be partners” was conclusory and
therefore no evidence of an expression of intent to be partners); Torres v.
Kelley, No. 13–04–313–CV,
2007 WL 528849, at *4 (Tex.App.—Corpus Christi Feb. 22, 2007, no pet.) (mem.
op.)(“While it is true that both parties and their attorneys made numerous
statements about a partnership to be formed, such conclusory statements are no
evidence of the formation of a partnership contract.Mere personal belief there
may be a partnership is not probative evidence.”). Thus, Brown’s testimony that
he believed himself to be partners with Keel is not, alone, evidence of a legal
partnership. While Brown identified certain bases for his conclusion, such as
his and Keel’s agreement to share profits and losses 50-50, we may not consider
evidence of the other partnership factors in determining whether the parties
expressed an intent to be partners. Ingram,
288 S.W.3d  at 900. Moreover, while Brown
testified that he understood the term “principals” to mean “partners,” there is
no evidence that anyone else shared that understanding. Cf. Hoss, 338
S.W.3d at 644(“Moreover, ‘there must be evidence that both parties expressed their intent to be partners.’”) (quotingReagan v. Lyberger, 156 S.W.3d 925, 928
(Tex. App.—Dallas 2005, no pet.)).

But the jury could reasonably have inferred from Brown’s
testimony that he and Keel “express[ed] [their] mutual intent to be partners”
and “shook hands” on it, that he and Keel made mutual statements to each other
that they were partners. See Ingram,
288 S.W.3d at 900 (stating the evidence of intent “could include, for example,
the parties’ statements that they are partners . . . .”). Although Keel denied
having made such a statement, the jury was free to credit Brown’s testimony and
discredit Keel’s contradictory testimony. See
City of Keller, 168 S.W.3d at 819; Hoss,
338 S.W.3d at 641. Brown’s testimony that he and Keel “shook hands” on their
agreement before embarking on their trip to New York in search of investors is
some evidence that they intended their expression to have significance to their
business endeavor. Cf. Ingram, 288
S.W.3d at 900 (stating that “merely referring to another person as ‘partner’ in
a situation where the recipient of the message would not expect the declarant
to make a statement of legal significance” is not sufficient because the
parties could be using the term in a colloquial sense, but the term “could
constitute legally significant evidence of expression of intent when made in a
circumstance that indicates significance to the business endeavor.”). 

This factor provides support for the jury’s partnership
finding.

C.      Sharing
control of business

          As noted above, sharing of control,
like sharing of profits, is typically given particular importance in the
analysis of whether a partnership exists. Seeid.
at 896; Big Easy Cajun, 293
S.W.3d  at 348.The right to control a
business is the right to make executive decisions.See Ingram, 288 S.W.3d at 901–02; Guerrero v. Salinas, No. 13–05–323–CV, 2006 WL 2294578,
at *11 (Tex.App.—Corpus Christi Aug. 10, 2006, no pet.);Tierra Sol Joint Venture v.
City of El Paso, 155 S.W.3d
503, 508 (Tex.App.—El Paso 2004, pet. denied). 

          As evidence of shared control, Brown
relies on his testimony that one of the terms of their partnership agreement
was that he and Keel would “both be a part of the management team” and that
they both agreed to “participate in the control of the business.” He also testified
that he and Keel worked together and “went back and forth” on all of the
spreadsheets, presentations, and documents they prepared for their venture.
Keel likewise testified that he and Brown worked together on the spreadsheets
they presented to Oaktree and that Brown took the lead in the negotiations with
Oaktree on behalf of both of them. Keel testified that Brown would negotiate
with Oaktree and report back to Keel on the progress. 

This evidence constitutes some evidence that Brown
participated in the decision-making process of his venture with Keel. There is
no contrary evidence that decision-making authority was vested in Keel alone. 

This factor provides support for the jury’s partnership
finding.

D.      Sharing
losses or liability

The only evidence relating to the sharing of losses or
liabilities is Brown’s own testimony that he and Keel agreed to share losses
when they met before the New York trip in September 2004 and that they agreed
to share the “risk 50/50” when putting together early budget proposals. But
Brown’s testimony is evidence, and the jury was within its prerogative to
credit that testimony. See City of Keller,
168 S.W.3d at 819; Hoss, 338 S.W.3d
at 641. 

Keel argues that Brown talked about expenses, which are not
the equivalent of losses, and that Brown’s testimony about sharing the risk is
“conclusory.” But Brown specifically testified, on more than one occasion, that
he and Keel agreed to share “losses.” 
Keel’s “conclusory” challenge to Brown’s testimony is misplaced. The
testimony relates to a specific, disputed factual circumstance—what the parties
agreed to, if anything, regarding losses—and not the ultimate legal question—whether
the parties were partners. Cf. Hoss,
338 S.W.3d at 644 (rejecting conclusory lay witness testimony as to whether the
parties’ agreed to be partners); Ben Fitzgerald Realty Co. v. Muller,
846 S.W.2d 110, 121 (Tex. App.—Tyler 1993, writ denied) (under prior
partnership law, rejecting conclusory lay witness testimony that parties were
partners) (citing Murphy v. McDermott, Inc., 807 S.W.2d 606, 613 (Tex.App.—Houston [14th Dist.] 1991, writ
denied)).

This factor provides support for the jury’s partnership
finding.

E.      Contributing
money or property to the business

          Brown’s evidence of contributing to
the partnership includes (1) his testimony that he and Keel agreed to
contribute money to the business “if and when needed for closing,” (2) his
testimony that he incurred out-of-pocket expenses for travel and a Maverick
pitch book, and (3) his $80,000 loan to GulfWest.

          Keel asserts that Brown’s travel
expenses were reimbursed by SouthWest. Citing Hoss, 338 S.W.3d at 648, hefurther argues that “[t]o the extent
Brown had some out-of-pocket expenses for travel and the like, payment of
expenses is not a contribution to the partnership.” We agree that Brown’s
incurrence of costs for a pitch book and for travel, to the extent not
reimbursed by his employer, does not necessarily constitute contributing money
to the partnership. See id.(“Evidence that business expenses were
paid by a credit card, in and of itself, is not evidence that money or property
was contributed as capital to the business.”) 

Brown’s loan to GulfWest, however, can constitute
contributing money to a partnership. See
Reagan, 156 S.W.3d at 928 (holding that loan from one party to another was
evidence of fifth partnership factor); see
also Hoss, 338 S.W.3d at 647 (citing Reagan,
156 S.W.3d at 928). The loan was not from a purported partner to the
partnership entity or to another partner; instead, the loan was from two
purported partners individually to third-party. But Keel admitted in his
testimony that the loan was made in order to cover GulfWest’s due diligence
costs relating to the proposed investment transaction and that he and Brown
agreed to come up with the money together. Brown testified that the loan was
made on behalf of the partnership and that they funded the loans individually,
rather than through a partnership vehicle, only for legal and accounting simplicity.
This is some evidence that Brown’s $80,000 loan to GulfWestwas made in
contribution to Brown and Keel’s partnership venture. Brown’s testimony that he
and Keel had agreed to contribute to closing costs as needed is also some
evidence of an agreement to contribute money to the partnership. 

This factor provides support for the jury’s partnership
finding.

F.      Conclusion

Considering this evidence in its totality, we conclude that the evidence
is legally sufficient to support the jury’s finding that Brown and Keel were
partners.See Ingram, 288 S.W.3d  at 899-904 (applying totality-of-the-circumstances
test). The trial court therefore erred in granting JNOV on the ground that
there was no evidence of a partnership.

We sustain Brown’s first issue.

Causation

          In
his second issue, Brown contends that the trial court erred in entering JNOV on
the ground that there was no evidence of causation. In his motion for JNOV,
Keel asserted that there was no evidence that Keel’s conduct proximately caused
Brown not to receive stock options in the new company. Keel relied on the
following testimony from Baker as conclusively proving that Oaktree would not
have proceeded with the GulfWest transaction if it required hiring Brown:

Q.     Would Oakree have hired Mr. Brown and Mr.
Keel at Oaktree in February of 2005?

 

A.     We were not prepared to go forward with the
investment with — if it required both Mr. Brown and Mr. Keel were employees.

 

Q.     What if — what if Mr. Keel in
February of ’05 came to ya’ll and said he wasn’t coming to GulfWest without Mr.
Brown? What would Oaktree have done?

 

A.     We would have walked away from the
investment. We were — we were uncomfortable with Mr. Brown as the
CFO at that point.

 

          Brown
makes two responses to these arguments. First, Brown argues that even if
Oaktree did not want to hire him as CFO, they could still hire him in another
position and grant him the stock options that he had negotiated for himself and
Keel, which Keel received. Second, Brown argues that even if Oaktree did not
hire him, they could have given him the equivalent of the stock options in the
form of warrants.

A.      Standards for causation of actual damages

          Under
certain circumstances, a claimant in a breach of fiduciary duty action may
recover damages in equity even when actual damages are not established; but
when a claimant seeks to recover actual damages, he must prove that the damage
he seeks were caused by the breach. See
Burrow v. Arce, 997 S.W.2d 229, 234–35, 240 (Tex. 1999). Brown sought to
recover actual damages and presented evidence based on the value of the stock
options package awarded to Keel. Question threeasked the jury to value Brown’s
damages, if any, that were proximately caused by Keel’s breach of his duty of
loyalty to Brown. The sole damages element submitted to the jury was “the value
of the stock options on February 28, 2005 that Brown would have received but
for the breach.”

“Proximate cause” subsumes two
elements: (1) cause in fact and (2) foreseeability. Akin, Gump, Strauss, Hauer& Feld, L.L.P. v. Nat’l Dev. &
Research Corp., 299 S.W.3d 106, 122 (Tex. 2009); Finger v. Ray, 326 S.W.3d 285, 291 (Tex. App.—Houston [1st Dist.]
2010, no pet.). In turn, “cause in fact” has two sub-elements: (a) the injury
would not have occurred “but for” the defendant’s conduct and (b) the conduct
was a substantial factor in bringing about the injury. Akin, Gump, Strauss, Hauer& Feld, L.L.P., 299 S.W.3d at 122; Finger, 326 S.W.3d at 291. “Causation
must be proved, and conjecture, guess, or speculation will not suffice as that
proof.” Akin, Gump, Strauss, Hauer&
Feld, L.L.P., 299 S.W.3d at 122.

Thus, Brown had the burden at trial
to present some evidence that: (1) Brown would have received the stock options
package “but for” Keel’s breach; (2) Keel’s breach was a substantial factor in
Brown’s not receiving the stock options; and (3) it was foreseeable that Keel’s
breach would cause Brown not to receive the stock options. Keel was entitled to
JNOV on the element of causation if there was no evidence of one or more of
these three components of proximate cause.

B.      Causation evidence

On January 30, 2005, Brown met with
Ford, Oaktree’s managing director and Baker’s superior. According to Brown,
Ford informed him that Oaktree would not hire him as CFO but stated that
Oaktree was still “very open to hearing about other positions that [he] could
have within the company and very open to discussions on that” and “open to
[him] getting the compensation package that [he] had negotiated.” Later that same
day, Ford sent an email to Baker telling Baker to “include [Brown] on the
email.” 

Baker also testified that Oaktree
“kept the door open for possibly hiring [Brown] in another position” after
determining not to keep him on as CFO. But Baker also testified that he and
Keel were opposed to hiring Brown at all:

Q.      . . . [S]o, he would have been part of the
management team, even though you didn’t want him as a CFO, right?

 

A.      Correct.

 

Q.      And, of course, [as] part of the
management team he would be entitled to all of the things that Mr. Keel got.

 

A.      Not all of [the] things, no.

 

Q.      Well — but you didn’t— never got to [that] point.

 

A.      We never had a negotiation because —

 

Q.
     Right. Because you asked Mr. Keel
what he thought about that, right?

 

A.      We did, yes.

 

Q.      And Mr. Keel said: No, don’t want him,
didn’t he?

 

A.      Yes. And I felt the same way at that
point.

 

Q.      Yeah. So, Mr. Keel is the one who
basically, as far as Oaktree was concerned, cut that rope that Mr. Brown was
hanging by, at least in February of ’05.

 

A.      I don’t agree with that.

 

After Ford’s meeting with Brown,
Ford raised the possibility of hiring Brown in another position with Keel. In
an email to Ford two days after his meeting with Brown, Keel stated:

Scott would like to speak
with you regarding his role going forward, assuming we get the deal closed. He
would also like for me to argue his value in taking the company forward.
Although I do believe Scott is a capable and creative professional, I am having
difficulty seeing his role if it is not that of CFO. Also, I would expect Joe [Grady]
to want a meaningful piece of the upside, which would have to be extracted from
Scott’s share of the management equity. 

 

Giving the above, I don’t
see much room for a compromise position. If you see it differently please let
me know and I will be glad to discuss it. I am not very interested in having a
3 way call where he wants me to demand his inclusion. If you get a chance in
the morning you may want to give me a call and we can discuss how to move
forward.

 

Within a week after Ford’s discussion with Brown,
Oaktree decided not to hire Brown at all. 

          Even
if the jury could have inferred that Keel’s resistance to hiring Brown in a position
other than CFO was a proximate cause of Oaktree’s decision not to hire Brown in
another position, there is no evidence that this caused the damages claimed by
Brown. Brown’s damages were not calculated based on a salary for this new
position. The damages question—which asked
about the damages proximately caused by Keel’s breach of loyalty—was limited to the value of the stock options
given to Keel. Keel contends that Oaktree had devoted all of the available
stock options to him, Joe Grady, who was hired as CFO
instead of Brown, and other members of the management team and that there is no
evidence that his actions caused Brown to lose stock options. Brown’s testimony
that Ford was open to discussions about Brown receiving the stock options is
not, alone, evidence that Keel’s conduct caused Oaktree not to give Brown the
stock options.[4]
According to Keel, “Brown would not have received stock options except as CFO.”
Brown cites to no evidence that, if he had been offered another position with
the new company, he would have received the same stock options package given to
Keel—or any stock options package.
Cf. id. at 116–17 (holding evidence
legally insufficient to support damages award for underlying judgment in
malpractice action when there was no evidence that plaintiff would have been
able to collect on underlying judgment); Doe v. Boys Clubs of Greater Dall., Inc., 907 S.W.2d 472, 477–78 (Tex. 1995)
(holding that even if defendant had a duty to investigate its volunteers,
breach of that duty was not the cause-in-fact of plaintiff’s sexual molestation
because there was no evidence that defendant would not have accepted molester
as volunteer if it had known about previous DWI conviction).Brown does
not identify any evidence of what positions Oaktreewould have considered him
for absent Keel’s resistance norany evidence that such positions would have
come with a stock options package. Absent such evidence, the jury had no basis
to conclude that, but for Keel’s conduct, Brown would have received the same stock
options package as Keel.[5]

Brown’s second argument, that
Oaktree could have given him the stock options in the form of warrants even
without hiring him, is similarly flawed. There is evidence in the record that
Oaktree could have given Brown warrants representing the stock options, but
there is no evidence that Oaktree ever considered doing so, much less that Oaktree
would have done so but for Keel’s conduct. To the contrary, after deciding not
to hire Brown at all, Oaktree offered Brown $500,000, or $250,000 plus 250,000 common share, in exchange
for a release. Brown rejected that offer, specifically asking that he be
awardedwarrants representing a
meaningful number of the shares being awarded in equity options negotiated for
management. Oaktree expressly refused that request, stating that it could not
“give [Brown] an ‘employee’ stock package when [he] was not going to be an
employee.” 

We overrule Brown’s second issue.
We hold that the trial court did not err in granting JNOV on the ground that
there is no evidence of causation. As a result of this holding, we need not
reach Brown’s damages issues.

Conclusion

          We affirm
the trial court’s judgment on the ground that there is no evidence of
causation.

 

                                                                   Harvey
Brown

                                                                   Justice


 

Panel
consists of Justices Jennings, Sharp, and Brown.

Justice
Sharp, dissenting.











[1]           Brown
does not contend that Volant is the partnership entity created between himself
and Keel. Cf. Lentz Eng’ing, LC v. Brown,
No. 14-10-00610-CV, 2011 WL 4449655, at *3
(Tex. App.—Houston [14th Dist.] Sept. 27, 2011, no. pet. h.) (“An association
or organization is not a partnership if it was created under the statute
governing the formation of LLCs.”). Volant is the investment vehicle that Brown
and Keel proposed Oaktree use to buy into GulfWest. 

 





[2]           Brown initially sued Oaktree too, but
he nonsuited Oaktree before trial.





[3]           Ingram
discusses these factors under the Texas Revised Partnership Act (TRPA), which expired on January
1, 2010. See Act
of May 31, 1993, 73d Leg., R.S., ch. 917, § 1, 1993 Tex. Gen. Laws 3887, 3890
(expired Jan. 1, 2010) (formerTex. Rev.
Civ. Stat. art. 6132b–2.02(a), 6132b–2.03(a)).After that date,
the Texas Business
Organizations Code (TBOC) applied to all partnerships, “regardless of their
formation date.” Ingram, 288 S.W.3d
at 894 n.4. Both TRPA and the TBOC identify the same five factors for
determining whether parties have formed a partnership. CompareTex. Bus.
Orgs. Code Ann.§
152.052(a) (West Supp. 2011), withTex.
Rev. Civ. Stat. art.6132b–2.03.

 





[4]           The dissent relies on the following
testimony from Brown as evidence that Keel’s conduct caused Brown to lose the
stock option package:

            

Q:        Was [Ford] open to your getting the
compensation package that you had negotiated?

 

                        A:        Yes.

 

But,
crediting this testimony as true, it is not enough that Ford was open to the
possibility; Brown must provide the jury with some evidence from which it could
infer that Brown could have and, more-likely-than-not would have, actually received
the stock option package if not for Keel’s conduct. We agree that Keel’s
conduct need not be the only proximate cause of Brown’s loss of the stock
package—the problem here
is that there is no evidence that there was ever a reasonable probability of
Brown receiving the same stock as the company’s CFO and CEO once Oaktree
determined that he was unfit for the CFO position.





[5]           We note that the jury could have reasonably
inferred that Keel breached his duty of loyalty to Brown by not informing him
of the discussion of the “CFO issue” in Baker’s January 9 email,and Brown may
have had a chance of repairing his relationship with Oaktree at that earlier
date than he did on January 30. However, the same causation problem arises—i.e., there is no
evidence of what position with the company Brown might have been offered if the
relationship had been repaired or what sort of compensation package might have
accompanied such a position.