**AFFIRMED and Opinion Filed August 29, 2022**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-20-00945-CV**
_____

**CITY OF DENTON, Appellant**

**V.**

**MICHAEL GRIM AND JIM MAYNARD, Appellees**

**On Appeal from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-08139**

## MEMORANDUM OPINION

Before Justices Molberg, Pedersen, III, and Smith
Opinion by Justice Molberg

Appellant City of Denton appeals a final judgment entered against it after a jury verdict in favor of appellees Michael Grim and Jim Maynard on their claims under the Texas Whistleblower Act (the Act).[1] In four issues, the City argues the Act does not apply as a matter of law and the evidence is legally and factually insufficient. We disagree and affirm the trial court's judgment.

---

[1] *See* TEX. GOV'T CODE §§ 554.001–.010. Under the Act, "[a] state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." *Id*. § 554.002(a).

# I. PROCEDURAL BACKGROUND

The facts are well known to the parties, and we do not detail them except as necessary to explain the basic reasons for our decision. *See* TEX. R. APP. P. 47.4.

Grim and Maynard sued the City in July 2017, claiming the City violated the Act in various respects regarding their employment. In their live pleading, Grim and Maynard claimed the City violated the Act by "terminating [them] on the basis of deliberately falsified accusations, and defaming them after the fact" in retaliation for their prior reports to City Attorney Anita Burgess about a leak of certain confidential information regarding the proposed Denton Energy Center (DEC),[2] information that was provided by then-current city council member Keely Briggs to the *Denton Record-Chronicle* (DRC), the local daily newspaper, and was then published online. Grim and Maynard claim Briggs's disclosure to DRC violated the Texas Open Meetings Act (TOMA), *see* TEX. GOV'T CODE §§ 551.001–.146, and the Texas Public Information Act (TPIA), *see id.*, §§ 552.001–.376.

In its answer, the City generally denied appellees' claims and asserted various affirmative defenses but did not include a plea to the jurisdiction or mention immunity from suit or liability. According to the record before us, the City has not challenged jurisdiction or claimed immunity in the trial court or in this Court.

---

[2] Grim testified the DEC was "a part of the entire Renewable Denton Plan, which consisted of renewable energy for the city and then a backup when the renewables weren't available." In their briefs, both parties describe the DEC as an electrical generation plant that runs on natural gas.

The case was tried to a jury. Fifteen witnesses testified, and more than eighty exhibits were admitted into evidence at trial.

At the close of appellees' case-in-chief, and again after both sides rested, the City moved for a directed verdict, arguing appellees failed to put on evidence they made a good faith report of a violation of law by the employing governmental entity or a public employee, with no mention of whether appellees' report had been made to an appropriate law enforcement authority. The trial court denied both motions.

During the formal charge conference, no objections were made to the charge, which instructed the jury, in part, "[a] party's conduct includes the conduct of its employees or of another who acts with the party's authority or apparent authority." The City did not object to that language and assigns no error regarding that instruction on appeal.

Over the City's objection,[3] the court submitted one broad-form liability question for each appellee with related definitions and instructions, and the jury answered "yes" to both:

[Question 1 for Grim; Question 3 for Maynard]:

Was [appellee's] report of an alleged violation of law made in good faith and a cause of the termination of [his] employment?

The report was a cause of [his] termination if it would not have occurred when it did but for the report being made. [Appellee] does not have to

---

[3] Specifically, the City argued questions one and three should not be submitted to the jury because there was "no evidence [appellees] reported a violation of law by the employing governmental entity or a public employee," with no discussion of whether appellees' report had been made to an appropriate law enforcement authority. The trial court overruled the objection.

prove the report was the sole cause of the termination. Rather, he must establish that he would not have been terminated had he not made a report of an alleged violation of law.

"Good faith," means that (1) [appellee] believed that the conduct reported was a violation of law and (2) his belief was reasonable in light of his training and experience.

Based on the jury's "yes" answers to both questions, the jury was also asked

the following question for each appellee, to which the jury answered "no":

[Question 2 for Grim; Question 4 for Maynard]:

Would the City have taken the same action inquired about in [question 1 for Grim; question 3 for Maynard] against [appellee] when it did based solely on information, observation, or evidence that is not related to the fact that [appellee] made a report of violation of law?

The jury then assessed Grim's and Maynard's damages from their firings.

Both sides filed post-trial motions after the jury's verdict, and in the course of

the parties' briefing, a question arose regarding the constitutionality of section

554.003(c)'s statutory caps—an issue not presented here.

The court denied the City's motion for JNOV, granted appellees' amended

motion for judgment, and indicated that, as requested, the court would notify the

attorney general regarding the question regarding constitutionality of the statutory

caps.[4] On July 31, 2020, the trial court entered a final judgment against the City and

in appellees' favor in an amount totaling $2,759,195.49, plus post-judgment interest

---

[4] The docket sheet in the record reflects the court sent that notice about two weeks after the hearing. Forty-five days later, the attorney general filed a response, asking, in part, that the court enter judgment capping damages as required under government code section 554.003. The court entered judgment sixty-six days after the attorney general's response.

–4–

at the rate of five percent per annum. The City timely moved for a new trial, arguing there was legally and factually insufficient evidence to support the jury's findings as to the elements that are now at issue in this appeal. After the motion for new trial was denied by operation of law, the City timely appealed.

## II. ISSUES

The City presents four issues on appeal.[5] Generally, the City maintains the Act does not apply as a matter of law because the reported violation of law was committed by Briggs, a person the City argues is not the employing governmental entity or its equivalent (first issue), and because the report was made to Burgess, a person the City argues is not an appropriate law enforcement authority (fourth issue). Additionally, the City argues the evidence is legally and factually insufficient to support the finding that appellees' reports caused their firings (second issue) and that

---

[5] The City presents the following four issues on appeal:

I. Did the District Court err in holding that, as a matter of law, an individual member of the unpaid Denton City Council acting without the Council's knowledge or sanction was either the "employing governmental entity" or "another public employee" within the meaning of the Whistleblower Act, thus rendering the Whistleblower Act applicable to this case?

II. Did the District Court err in concluding that there was legally and factually sufficient evidence to sustain the jury's finding that [appellees'] report of an alleged violation of law by an individual member of the Denton City Council caused them to be fired, when such firing—not by the City Council, but by the City Manager—occurred almost a year after the report and following an unrelated investigation of staff conduct with vendors?

III. Did the District Court err in concluding that there was legally and factually sufficient evidence to sustain the jury's finding that [appellees] had a good faith belief that the conduct of the Council Member they reported constituted a violation of law?

IV. Did the District Court err in holding that, as a matter of law, the then-City Attorney constituted an "appropriate law enforcement agency" to whom to make a report within the meaning of the Whistleblower Act?

they had a good faith belief the conduct they reported was a violation of law (third issue). The City asks us to reverse and render judgment in its favor.

## III. APPLICABLE STANDARDS

### A. Standard and Scope of Review

"Statutory construction is a question of law for the court to decide[,]" and we "review legal questions de novo." *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). Our primary objective when construing a statute "is to determine the Legislature's intent which, when possible, we discern from the plain meaning of the words chosen." *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 642 S.W.3d 551, 557 (Tex. 2022) (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

Generally, the "truest manifestation" of that intent is "what lawmakers enacted, the literal text they voted on." *Id*. (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006)). "If a statute is clear and unambiguous, we apply its words according to their common meaning without resort to rules of construction or extrinsic aids." *Id*. (quoting *In re Estate of Nash*, 220 S.W.3d at 917). "We use definitions the legislature prescribed and any technical or particular meaning the words have acquired." *Id*. (quoting *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008)). "Otherwise, '[w]ords not statutorily defined bear their common, ordinary meaning unless a more precise definition is apparent from the statutory context or the plain meaning yields an absurd result.'"

–6–

*Id.* (quoting *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018)).

The proper points of error for evidentiary sufficiency challenges depend on whether the complaining party had the burden of proof, with legal sufficiency points of error designated as "no evidence points" or "matter of law points," and factual sufficiency points of error designated as "insufficient evidence points" or "great weight and preponderance points." *See Raw Hide Oil & Gas, Inc. v. Maxus Expl. Co.*, 766 S.W.2d 264, 275 (Tex. App.—Amarillo 1988, writ denied). In this case, appellees had the burden of proof on the issues the City challenges in this appeal. *See* TEX. GOV'T CODE § 554.002(a) (public employee who sues under chapter 554 has burden of proof; except in some cases, a rebuttable presumption may apply); *compare id.* § 554.002(b) (describing employer's affirmative defense).

When a party challenges the legal sufficiency of the evidence to support an adverse finding on which it did not have the burden of proof, the party must demonstrate that no evidence supports the finding. *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam).[6] To determine whether legally sufficient evidence exists to support the finding, we "must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of*

---

[6] A party challenging the legal sufficiency of an adverse finding on an issue on which it has the burden of proof must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam).

*Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). "Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016). The "final test for legal sufficiency" is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827; *see Office of Att'y Gen. v. Rodriguez*, 605 S.W.3d 183, 192 (Tex. 2020).

When a party challenges the factual sufficiency of the evidence on an adverse finding on which it did not have the burden of proof, the party must demonstrate there is insufficient evidence to support the finding. *Hoss v. Alardin*, 338 S.W.3d 635, 651 (Tex. App.—Dallas 2011, no pet.).[7] When determining the factual sufficiency of the evidence to support a jury verdict, we "must consider and weigh all the evidence and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam) (citations omitted); *Harris Cty. v. Coats*, 607 S.W.3d 359, 380–81 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

[7] A party challenging the factual sufficiency of an adverse finding on an issue on which it has the burden of proof must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242.

–8–

Evidence is insufficient for factual sufficiency purposes if, after reviewing all the evidence in the record, we determine the evidence supporting the jury finding is so weak or the finding is so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Hoss*, 338 S.W.3d at 651. The amount of evidence needed to affirm a judgment is far less than the amount necessary to reverse one. *Shultz v. Shultz*, No. 05-20-00819-CV, 2022 WL 336564, at *2 (Tex. App.—Dallas Feb. 4, 2022, pet. filed) (mem. op.) (citing *Coats*, 607 S.W.3d at 381). If we reverse a trial court's judgment for factual insufficiency, we must "detail all the evidence relevant to the issue and clearly state why the jury's finding is factually insufficient or so against the great weight and preponderance of the evidence that it is manifestly unjust" and "how the contrary evidence greatly outweighs the evidence supporting the verdict." *Morris v. Wells Fargo Bank, N.A.*, 334 S.W.3d 838, 842–43 (Tex. App.—Dallas 2011, no pet.) (citations omitted).

In applying these sufficiency standards, we remain mindful that this Court is not a factfinder. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The trier of fact—in this case, the jury—is the sole judge of witness credibility and the weight afforded their testimony; we defer to the jury's determination regarding these matters and to its resolution of conflicting evidence. *See City of Keller*, 168 S.W.3d at 819–20; *McGalliard v. Kuhlmann*, 722 S.W.2d

694, 697 (Tex. 1986).[8] We "are not free to substitute [our] judgment for that of the jury simply because [we] may disagree with [its] verdict." *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

## B.     Texas Whistleblower Act Generally

Under the Act, "[a] state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee *who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority*." TEX. GOV'T CODE § 554.002(a) (emphasis added); *Rodriguez*, 605 S.W.3d at 191 (the Act "prohibits a government employer from taking an adverse personnel action against a public employee" who makes such reports); *McMillen v. Tex. Health & Human Servs. Comm'n*, 485 S.W.3d 427, 429 (Tex. 2016) (per curiam) (noting the Act "protects" public employees who make such reports).

Many of section 554.002's terms have been specifically defined in the Act. *See* TEX. GOV'T CODE § 554.001. "Local government entity" includes a municipality, *see id*. § 554.001(2)(B), and "[l]aw" is "a state or federal statute," "an ordinance of a local governmental entity," or "a rule adopted under a statute or ordinance." *Id*. § 554.001(1). Also, though not specifically defined by the

---

[8] In *McGalliard*, the court stated: "The trier of fact has several alternatives available when presented with conflicting evidence. It may believe one witness and disbelieve others[,] may resolve inconsistencies in the testimony of any witness[,] and may accept lay testimony over that of experts." 722 S.W.2d at 697 (citations omitted).

legislature, various courts have interpreted certain other phrases in section 554.002, including "good faith,"[9] and "reports a violation of law."[10]

Various courts have also interpreted the phrase "appropriate law enforcement authority."[11]

---

[9] "'Good faith' means that (1) the employee believed that the conduct reported was a violation of law and (2) the employee's belief was reasonable in light of the employee's training and experience." *Wichita Cty. v. Hart*, 917 S.W.2d 779, 784 (Tex. 1996); *see McMillen*, 485 S.W.3d at 429 (to be in "good faith," employee's belief about the reported-to authority's powers must be "reasonable in light of employee's training and experience") (quoting *Needham*, 82 S.W.3d at 321). The second part ensures "the reporting employee only receives Whistleblower Act protection if a reasonably prudent employee in similar circumstances would have believed that the facts as reported were a violation of law." *Needham*, 82 S.W.3d at 320 (citing *Hart*, 917 S.W.2d at 785).

[10] The phrase "reports a violation of the law" has been interpreted as including "any disclosure of information regarding a public servant's employer tending to directly or circumstantially prove the substance of a violation of criminal or civil law, the State or Federal Constitution, statutes, administrative rules or regulations." *Llanes v. Corpus Christi Indep. Sch. Dist.*, 64 S.W.3d 638, 642 (Tex. App.—Corpus Christi–Edinburg 2001, pet. denied) (citation omitted); *see Galveston Cty. v. Quiroga*, No. 14-18-00648-CV, 2020 WL 62504, at *6 (Tex. App.—Houston [14th Dist.] Jan. 7, 2020, no pet.) (mem. op.) (quoting *Llanes*). While it may not be necessary to prove an actual violation or for a report to specify the law being violated, there must be some law prohibiting the complained-of conduct to give rise to a claim under the Act. *Mullins v. Dall. Indep. Sch. Dist.*, 357 S.W.3d 182, 188 (Tex. App.—Dallas 2012, pet. denied) (citing *Llanes*, 64 S.W.3d at 642). "Other complaints and grievances, including alleged violations of an agency's internal procedures and policies, will not support a claim." *Id.* (citation omitted). Whether the conduct a public employee reports constitutes a violation of law is a question of law. *See Guillaume v. City of Greenville*, 247 S.W.3d 457, 461–62 (Tex. App.—Dallas 2008, no pet.) (citation omitted).

[11] A report is made to an appropriate law enforcement authority "if the authority is a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to: (1) regulate or enforce the law alleged to be violated in the report; or (2) investigate or prosecute a violation of criminal law." TEX. GOV'T CODE § 554.002(b). The supreme court has explained this as follows:

> The Whistleblower Act speaks to an authority statutorily empowered to regulate under or enforce the actual law allegedly violated—"the particular law the public employee reported violated is critical to the determination"—or to investigate or prosecute a criminal violation. The upshot of our prior decisions is that for an entity to constitute an appropriate law-enforcement authority under the Act, it must have authority to enforce, investigate, or prosecute violations of law against third parties outside of the entity itself, or it must have authority to promulgate regulations governing the conduct of such third parties. Authority of the entity to enforce legal requirements or regulate conduct within the entity itself is insufficient to confer law-enforcement authority status.

*Univ. of Tex. Sw. Med. Ctr. v. Gentilello*, 398 S.W.3d 680, 686 (Tex. 2013) (citation and internal footnote omitted); *see McMillen*, 485 S.W.3d at 429; *Needham*, 82 S.W.3d at 320.

The Act "provides a general remedy for retaliation based on the report of any violation of law" and "is a broad remedial measure intended to encourage disclosure of governmental malfeasance and corruption." *City of Waco v. Lopez*, 259 S.W.3d 147, 154 (Tex. 2008) (citations omitted).

The Act's underlying purposes are twofold: (1) to enhance open government by protecting public employees from retaliation by their employers when an employee reports a violation of the law in good faith, and (2) to secure lawful conduct by those who direct and conduct the affairs of government. *Herrera v. Dall. Indep. Sch. Dist.*, 609 S.W.3d 579, 588 n.15 (Tex. App.—Dallas 2020, pet. denied).

The Act requires a "but-for" causation standard, under which the public employee "must prove that the adverse action 'would not have occurred when it did' if the employee had not reported the violation" but "need not prove that the report was the 'sole' or the 'substantial' reason for the adverse personnel action." *Rodriguez*, 605 S.W.3d at 192 (citing *Tex. Dep't of Human Servs. of State of Tex. v. Hinds*, 904 S.W.2d 629, 634–36 (Tex. 1995)).[12]  An adverse action "'based solely' on reasons unrelated to a good-faith report of a legal violation destroys the causal link." *Id.*  (citing *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000)).

Because evidence of but-for causation is often circumstantial, courts are to examine all of the circumstances and consider a number of factors in determining

---

[12] This "best protects employees from unlawful retaliation without punishing employers for legitimately sanctioning misconduct or harboring bad motives never acted upon." *Hinds*, 904 S.W.2d at 636.

whether the standard has been met, such as temporal proximity between the protected activity and the adverse action, knowledge of the protected activity, expression of a negative attitude toward the employee's protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence the employer's stated reason to justify the adverse action is false. *Apache Corp. v. Davis*, 627 S.W.3d 324, 325–26 n.3 (Tex. 2021); *see Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 790 (Tex. 2018) (citing *Zimlich*, 29 S.W.3d at 69); *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450–451 (Tex. 1996). However, if the basis for the suspension, termination, or other adverse personnel action is undisputed, these factors do not support an inference of the necessary but-for causation. *See Apache Corp.*, 627 S.W.3d at 337 (stating this in a non-whistleblower case requiring but-for causation).

A public employee who sues under the Act has the burden of proof, except if the employee's suspension, termination, or other adverse personnel action against the employee occurs not later than the ninetieth day after the date on which the employee reports a violation of law, the suspension, termination, or adverse personnel action is presumed, subject to rebuttal, to be because the employee made the report. TEX. GOV'T CODE § 554.004(a).

It is an affirmative defense to a chapter 554 whistleblower suit that the employing state or local governmental entity "would have taken the action against

–13–

the employee that forms the basis of the suit based solely on information, observation, or evidence that is not related to the fact that the employee made a [protected] report." *Id*. § 554.004(b).

## IV. ANALYSIS

### A.    Jurisdiction and Governmental Immunity

Before we address the City's issues, we acknowledge "the fundamental precept that a court must not proceed on the merits of a case until *legitimate challenges to its jurisdiction have been decided*." *Hillman v. Nueces Cty.*, 579 S.W.3d 354, 359 n.5 (Tex. 2019) (emphasis added) (quoting *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004)).

Here, there is no need to decide such challenges, as the merits were reached in the trial court, and no such challenges have been raised. Despite this, both the City's amici[13] and the dissent focus on jurisdictional and immunity grounds—a wayward path based on the procedural posture and issues presented.

As the Texas Supreme Court recently stated:

Governmental immunity[14] protects the State's political subdivisions, including its cities, against suits and legal liability. Governmental

---

[13] The Texas Municipal League and the Texas City Attorney Association filed an amicus curiae brief on behalf of the City, generally arguing we should reverse and render judgment dismissing this case for want of subject matter jurisdiction because the legislature has not waived immunity for the types of reports appellees made here. The City has not raised any issue regarding jurisdiction or immunity, however. In fact, in the 28,981 words the City uses in its briefs, the word "jurisdiction" is never used, and "immunity" appears a mere five times. As we further explain in this section in the main body of the opinion, we need not decide any question regarding jurisdiction or immunity under the circumstances.

[14] Sovereign immunity, usually called governmental immunity when referring to political subdivisions, protects governmental entities against suits and legal liabilities. *City of Hous. v. Hous. Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 575 (Tex. 2018); *see Rusk State Hosp. v. Black*, 392 S.W.3d 88, 93 (Tex. 2012)

–14–

immunity therefore bars suit against the City . . . unless the Legislature has waived the City's immunity. Cities retain immunity unless the Legislature clearly and unambiguously waives it. We defer to the Legislature in waiving immunity because it is in a better position to weigh the conflicting public policy interests associated with subjecting the government to liability.

Governmental immunity encompasses two related but distinct concepts: "immunity from liability, which bars enforcement of a judgment against a governmental entity, and immunity from suit, which bars suit against the entity altogether." A statute can waive immunity from suit, immunity from liability, or both.

*Dohlen v. City of San Antonio*, 643 S.W.3d 387, 392 (Tex. 2022) (internal citations omitted). Additionally, because only immunity from suit implicates a court's subject-matter jurisdiction,[15] "immunity from suit is properly raised in a plea to the jurisdiction while immunity from liability[16] is not." *Id*.

In some cases, the legislature has waived immunity from suit "to the extent of liability," which merges the two concepts and collapses the jurisdictional and merits inquiries to some degree. *Id*. (citations omitted). When a statute does this, the inquiry is "direct[ed] . . . to the statute's elements and may require a court to consider those elements at both the jurisdictional and merits stages." *Id*. (citing *Lueck*, 290

(sovereign immunity embodies two concepts: immunity from suit, which completely bars actions against governmental entities unless the legislature expressly consents, and immunity from liability, which protects governmental entities from judgments); *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009) ("Generally, governmental entities are immune from suit and liability under the doctrine of sovereign immunity."). Unless otherwise specified herein, our reference to "immunity" refers to immunity from suit, not immunity from liability.

[15] Sovereign immunity "*implicates* subject-matter jurisdiction [but] does not necessarily *equate* to a lack of subject-matter jurisdiction." *Rusk State Hosp.*, 392 S.W.3d at 95.

[16] Immunity from liability is an affirmative defense that is waived if not pleaded. *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999) (citing, in part, TEX. R. CIV. P. 94) (other citations omitted).

S.W.3d at 883). Thus, because the Act waives immunity from suit to the extent of liability,[17] "the elements of section 554.002(a) can be considered to determine both jurisdiction and liability." *See Lueck*, 290 S.W.3d at 883.

Because of this, and because the City has not challenged jurisdiction or claimed immunity in any way, we see no need to consider section 554.002(a)'s elements for jurisdictional purposes and focus instead on liability. *Cf. Univ. of Hous. v. Barth*, 313 S.W.3d 817, 818 (Tex. 2010) (per curiam) (remanding case to court of appeals for consideration of whether trial court had jurisdiction over Barth's suit under *Lueck* after noting university had challenged jurisdiction, unlike the situation here). Thus, to the extent the City challenges section 554.002(a)'s elements, we consider them not to determine jurisdiction, as the dissent does, but to determine liability.

"[W]hile a court is obliged to examine its subject-matter jurisdiction on its own in every case," the Texas Supreme Court has "never suggested that a court should raise immunity on its own whenever the government is sued." *Rusk State Hosp.*, 392 S.W.3d at 102 (Hecht, J., concurring). But the dissent would have us do just that, and in doing so, would have us take a path that bucks the modern trend of

---

[17] Under the Act, "[s]overeign immunity is waived and abolished to the extent of liability for the relief allowed under [government code chapter 554] for a violation of [chapter 554,]" and "[a] public employee who alleges a violation of [chapter 554] may sue the employing state or local governmental entity for the relief [chapter 554] provide[s]." TEX. GOV'T CODE § 554.0035; *see City of Celina v. Scott*, No. 05-21-00823-CV, 2022 WL 1101589, at *3 (Tex. App.—Dallas Apr. 13, 2022, pet. filed) (mem. op.) (noting the Act "waives immunity from suit to the extent a governmental entity is liable under its provisions").

reducing the vulnerability of final judgments to attack based on an alleged lack of subject matter jurisdiction. *See, e.g.*, *Engelman Irrigation Dist. v. Shields Bros.*, 514 S.W.3d 746, 752 (Tex. 2017) (discussing trend, citing cases).

We decline to take that path. Instead, we consider the case on its merits and focus on the four issues the City presents. *See* TEX. R. APP. P. 47.1 (we "must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal"); *Lueck*, 290 S.W.3d at 883 (section 554.002(a) elements can be considered to determine both jurisdiction and liability).

## B. Applicability of the Act

### 1. Employing Governmental Entity

The first question we must decide is whether appellees reported a violation of law by "the employing governmental entity." *See* TEX. GOV'T CODE § 554.002(a).[18] In its first issue, the City argues Briggs—who disclosed the confidential DEC

---

[18] We need not and do not decide whether Briggs could be considered a "public employee" under the Act because the City argues, and appellees agree, Briggs cannot be considered as another public employee under the Act because she was not paid for her services as a council member at the time of the alleged violation of law. *See* TEX. R. APP. P. 47.1 (our written opinion must be as brief as practicable but address every issue raised and necessary to the appeal). We express no opinion on whether this is accurate. The Act defines "public employee" as "an employee or appointed officer other than an independent contractor who is paid to perform services for a state or local governmental entity." TEX. GOV'T CODE § 554.001(4). We also express no opinion on whether the phrase "who is paid to perform services for a state or local governmental entity," in section 554.001(4) modifies "employee," "appointed officer," "independent contractor," or some combination thereof. *See id.*

–17–

information to DRC—acted personally and not in any official capacity and thus is not, as a matter of law, "the employing governmental entity."[19]

Grim and Maynard dispute this and argue Briggs's conduct was not purely personal and was related to her role as a council member or to the public interest.

To support their positions, the parties cite the same cases[20] but emphasize different facts, with the City emphasizing Briggs's status as an unpaid council member and its response to her disclosure, and Grim and Maynard focusing on the context in which she obtained and disclosed the confidential information to DRC.

*Rangel* and *Johnson*, which both parties cite, are distinguishable. Each involved an interlocutory appeal of a denial of a government entity's plea to the jurisdiction and were based on different facts than those in the record before us. *See Rangel*, 131 S.W.3d at 544–45 (interlocutory appeal regarding denial of public housing authority's plea to the jurisdiction on Rangel's whistleblower claim based on reports of violations of law by two unpaid commissioners, one who allegedly misappropriated public funds and one who allegedly unlawfully applied for increased public benefits for personal purposes);[21] *Johnson*, 48 S.W.3d at 892, 895

---

[19] This argument is essentially the same as the City's "no evidence" arguments in its motions for directed verdict and in its objections to the submission to the jury of the two liability questions.

[20] *See Hous. Auth. of City of El Paso v. Rangel*, 131 S.W.3d 542 (Tex. App.—El Paso 2004, pet. granted, judgm't vacated w.r.m.); *City of Cockrell Hill v. Johnson*, 48 S.W.3d 887 (Tex. App.—Fort Worth 2001, no pet.).

[21] Rangel reported that the commissioner alleged to have unlawfully applied for increased public benefits "falsified documentation in order to obtain benefits from the Section 8 new construction and voucher programs" and "misrepresented information in order to be moved out of public housing and into a

(interlocutory appeal regarding denial of plea to the jurisdiction and summary judgment motion on Johnson's whistleblower claim based on request to sheriff's department to investigate alleged sexual assault by Smith, a city alderman, and report to the district attorney's office regarding Smith's alleged use and sale of narcotics).

In deciding whether the alleged violations of law were by the "employing governmental entity" in those cases, our sister courts examined whether the alleged wrongful acts were in the scope of the wrongdoer's duties based on the facts in each case. *See Rangel*, 131 S.W.3d at 547–48 (concluding actions by two commissioners fell within their official duties and the agency's affairs and should be construed as acts of the employing governmental entity); *Johnson*, 48 S.W.3d at 895–97 (concluding alderman's alleged assault, sexual assault, and drug-related activities were actions taken in personal capacity and report about those actions was not protected under the Act, when actions did not relate to affairs of the City itself, were detrimental primarily to the individuals involved, not to society in general, and were "not things the public would be concerned about simply because of [his] status as an elected official").

We agree with this general approach, which is not unlike many situations involving agency—situations which often involve a fact-intensive question of the extent to which the acts of one can be imputed to a third party in a particular context.

---

Section 8 home." *Rangel*, 131 S.W.3d at 545. Rangel alleged this violated federal rules and regulations and constituted welfare fraud. *Id*.

Here, the jury received a wealth of information about the context in which Briggs publicly disclosed confidential information about the DEC to DRC. Briggs testified she opposed the DEC proposal because of the financial and environmental risks to the City and because the City already had a coal plant. She also testified that to address these concerns, she posed a lot of questions to city staff, to the public, and to anyone she could because she is not an industry leader and looked to others to help her understand more information.

Briggs testified that initially, she requested information about the DEC as a steward for the taxpayer's money and out of a concern regarding a particular payment the City had made. Briggs did not use the typical records request process members of the public would have used and instead requested "everything related to DEC" from the interim city manager.

Briggs requested the information on or about August 25, 2016, and received two stacks of information, one of which was marked confidential. Briggs reviewed some of the information with a fellow city council member, Sara Bagheri, who, along with Briggs and the mayor, was also opposed to the DEC. Briggs invited the DRC reporter to come to her house to get the documents, and once the reporter came to get them, Briggs let Bagheri know she had done it. Briggs testified she did not intend to provide confidential information to DRC but agreed she did so unintentionally. Before providing information to DRC, Briggs redacted certain

information in an attempt to be "extra careful" but admitted she was "not careful enough, by a long shot."

On September 13, 2016, the same day Briggs successfully moved to postpone a vote on the DEC contracts, the DRC published the information Briggs provided. A week later, by a vote of four to three, the city council approved the DEC contracts, with Briggs, Bagheri, and the mayor voting against them.

We disagree with the City's argument that Briggs's conduct is more similar to the misconduct in *Johnson* than in *Rangel*. While we find both cases distinguishable, Briggs's conduct is much more like commissioner Lozano's alleged conduct in *Rangel* than to alderman Smith's alleged conduct in *Johnson*.

In *Johnson*, our sister court reasoned that Smith's alleged violations of law were not by the employing governmental entity because they did not relate to the affairs of the city itself, were detrimental primarily to the individuals involved, not to society in general, and were "not things the public would be concerned about simply because of Smith's status as an elected official." *See Johnson*, 48 S.W.3d at 895–97. In *Rangel*, our sister court reasoned that Lozano's alleged violation of law was by the employing governmental entity because her alleged misconduct in procuring additional benefits could fall within the official duties of a commissioner and her misstatement of income would be the type of conduct the public would be concerned about if committed by an appointed official. *See Rangel*, 131 S.W.3d at 547–48.

Here, Briggs's alleged misconduct in providing information to DRC about the DEC could fall within her official duties of a city council member, at least insofar as it related to her votes regarding the DEC contracts. Moreover, her disclosure of confidential information about the DEC to DRC would be the type of conduct the public would be concerned about if committed by an appointed city council member, as it could jeopardize pending or future contracts with the City or possibly expose the City to further liability.

Based on the record before us, we conclude, as a matter of law, Grim and Maynard made a report of a violation of law by the "employing governmental entity." Briggs's actions related to the public interest and her role as a council member, were not purely personal, and should be construed as acts of the City, at least for the purpose of determining coverage under the Act.[22] *See Office of Att'y Gen. of Tex. v. Brickman*, 636 S.W.3d 659, 672–74, 672 n.13, 673 n.15 (Tex. App.—Austin 2021, pet. pending) (rejecting arguments similar to those made by the City here—that the legislature intended to insert principles of ultra vires into the Act[23] implicitly excluding elected officials under the Act and that elected officials cannot be considered as employees of the agencies they direct—and stating, in light of the broad remedial nature of the Act, "it seems reasonable to conclude that the

---

[22] We need not decide, and express no opinion on, whether Briggs's actions would subject the City to any liability in any contract or tort claim brought by a third-party against the City regarding the disclosure.

[23] *Brickman* states, "A suit under the Act is not transformed into an ultra vires suit by virtue of the fact that the reported violations of law might also be pled as ultra vires acts against [an elected official] personally." 636 S.W.3d at 672, n.13.

legislature intended the statute to be more inclusive, sweeping up appointed officials whose bad acts might otherwise not fall within the ambit of the Act, rather than less"); *Rangel*, 131 S.W.3d at 547–48 (conclusions regarding Lozano).[24]

We overrule the City's first issue.

## 2. Appropriate Law Enforcement Authority

In its fourth issue, the City argues that, as a matter of law, the Act does not apply because Burgess was not "an appropriate law enforcement authority" to whom to make a report. Grim and Maynard dispute this.

We need not decide the City's fourth issue because the City failed to preserve error, as the City did not request or receive any ruling on this element, based on the record before us. *See* TEX. R. APP. P. 33.1.[25] Also, to the extent the City argues the

---

[24] *See also Magana v. Mills Elec. Contractors, Inc.*, No. 05-98-01004-CV, 2000 WL 1073610, at *1 (Tex. App.—Dallas July 24, 2000, no pet.) (mem. op.) (reversing summary judgment after concluding, in negligence case, that fact question existed on whether tortfeasor's acts were committed in course and scope of employment). We cite *Magana* for the sole purpose of showing that course-and-scope evidence can create a fact question for a fact-finder. Although we decide the City's first issue as a matter of law, at a minimum, the evidence created a fact question for the jury based on the facts before us.

[25] Rule 33.1 states, in part:

> (a) In General. As a prerequisite to presenting a complaint for appellate review, the record must show that:

>> (1) the complaint was made to the trial court by a timely request, objection, or motion that:

>>> (A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context; and

>>> (B) complied with the requirements of the Texas Rules of Evidence or the Texas Rules of Civil or Appellate Procedure; and

>> (2) the trial court:

–23–

evidence on this issue is legally or factually insufficient, those two issues are inadequately briefed.[26]

We overrule the City's fourth issue.[27]

## C.     Sufficiency of the Evidence

### 1.     Good Faith Belief of Violation of Law

In its third issue, the City argues the evidence is legally and factually insufficient to sustain the jury's finding that appellees had a good faith belief that Briggs's conduct constituted a violation of law. Specifically, the City contends there was no evidence presented that Briggs violated any law or that appellees had a good faith belief she violated any law and that no legal actions were brought against Briggs. Although the City frames its argument as one challenging the legal and factual sufficiency of the evidence, because the City makes no attempt to make the

---

(A) ruled on the request, objection, or motion, either expressly or implicitly; or

(B) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal.

[26] In the body of its appellate brief, the City includes a twelve-line paragraph arguing, in conclusory fashion, that "to the extent the question of whether city attorney Burgess was an appropriate law enforcement authority involves questions of fact, there was legally and factually insufficient evidence to support a factual finding that [she] was an appropriate law enforcement authority." Lacking, however, is any analysis of the law or its application to the facts. *See* TEX. R. APP. P. 38.1(i) (brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record).

[27] The City did not raise its fourth issue in its motions for directed verdict, in its objections to the submission of the two liability questions that were submitted to the jury, or in the joint hearing on its motion for JNOV and appellees' amended motion for judgment. The City's motion for JNOV is not included in the record.

required showing regarding factual sufficiency, we will limit our review to whether the evidence is legally sufficient to support the jury's finding.[28]

As the City points out in its brief, appellees presented evidence at trial that they believed Briggs violated TOMA and TPIA when she disclosed emails containing competitive public power utility information, such as costs and pricing, to DRC. The City, however, maintains such release is not a violation of law because the government code does not prohibit its release but instead provides the competitive information is not subject to disclosure under the TPIA and that the public power utility governing body is not required to conduct an open meeting to discuss such competitive information. *See* TEX. GOV'T CODE §§ 551.086, 552.133. Therefore, the City asserts it is optional to keep the information confidential, but it is not illegal to disclose it.

Appellees argue the evidence shows they believed, based upon their training from former City Attorney Burgess, that Briggs's disclosure of the competitive bidding information did violate TOMA and TPIA, constituted official misconduct, and was punishable as a misdemeanor. We agree the evidence supports appellees'

---

[28] In *Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 733 (Tex. 2020), the court stated, "A party attacking the factual sufficiency of a finding on appeal must 'demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence.'" (quoting *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam)). In that case, the court concluded the appellant did this by discussing both supporting and countervailing evidence to support the challenged finding. *See Lion Copolymer Holdings*, 614 S.W.3d at 733. Unlike the appellant in that case, *see id.*, in this case, the City's analysis is done only in "no evidence" terms, not through any comparison or weighing of the evidence and countervailing evidence to support or contradict that finding.

belief.  While the government code may allow the public power utility governing body to choose whether to keep its competitive information confidential or release it to the public, the City had operated to keep the information confidential.  This is evidenced by the fact that the City discussed such information in closed sessions and, when Briggs received the emails she requested from former interim City Manager Howard Martin, she received a stack marked confidential and one marked non-confidential.  She too believed some information in the non-confidential stack was confidential and not subject to release and attempted to redact the information before providing it to the newspaper.

Furthermore, the government code also provides that information submitted to a governmental body by a vendor is excepted from release if the vendor shows the information would reveal an individual approach to pricing, cost data, and other internal information or would give advantage to a competitor.  *Id.* § 552.1101(a).  The statute further provides, "[a] governmental body shall decline to release [the] information" unless the vendor chooses not to assert the exception to its release. *Id.* § 552.1101(c).  Here, the two vendors whose information was released had confidentiality agreements in place with the City prior to making a bid and never authorized a release.  Additionally, once the vendors learned of the disclosure, they sent letters to the City expressing their concerns that their information had been made public.

Moreover, the evidence at trial showed the city attorney's office provided training to the council and the DME regarding the requirements of TOMA and the TPIA. The training warned city council members and city employees violations could constitute official misconduct and were punishable as misdemeanors. The City also had previously prepared a separate report that could be shared with the public regarding the DEC, redacting public utility competitive information from the original report. Thus, based on appellees' experience and training that they received from the City, some evidence supports the finding that their belief Briggs violated the law was reasonable. *See Hart*, 917 S.W.2d at 784.

The City's actions also support a finding that appellees had a good faith belief Briggs violated the law. Former City Attorney Burgess reminded city council members about the confidentiality of some of the items they were reviewing and the penalty for violating such confidentiality just a few days before Briggs provided the documents to the newspaper. And, after reviewing the documents, Burgess informed Briggs some of the information she released was the type of confidential information Burgess had previously warned the council about releasing, which was punishable as a Class B misdemeanor, and the city attorney's office could not represent her because her interests appeared to be adverse to the City's. The fact that Briggs was not ultimately prosecuted does not detract from appellees' good faith belief she violated the law. As a result of appellees' report, Burgess contacted the newspaper, and it removed the confidential documents from its website.

In viewing the evidence in the light most favorable to the verdict, we conclude a reasonable and fair-minded juror could find appellees had a good faith belief Briggs violated the law by disclosing confidential information to DRC and, thus, the evidence is legally sufficient to support the jury's finding on this issue. *See City of Keller*, 168 S.W.3d at 827.

### 2. But-For Causation

In its second issue, the City contends the evidence was also legally and factually insufficient to sustain the jury's finding that appellees' report of Briggs to Burgess was the cause of their termination when it was the city manager who terminated them, not Briggs, and their termination occurred almost a year after the report and after a separate investigation into their conduct with vendors. The City maintains Briggs did not know appellees reported her until they filed this suit against the City and Deputy City Manager Langley and City Manager Hileman did not know appellees made the report until after their termination. In short, the City asserts there was no elaborate termination scheme against appellees.

Appellees respond that the circumstantial evidence shows otherwise and supports the jury's finding that appellees would not have been terminated but for their report of Briggs. Appellees contend the evidence shows they were treated differently than similarly situated employees, key individuals involved in the investigations leading to their termination knew about their report of Briggs, the

investigations were designed to entrap appellees rather than truly investigate the procurement process, and the City's reasons for the terminations were pretextual.

In determining whether appellees presented sufficient evidence of causation, we may consider circumstantial evidence such as (1) knowledge of the report of illegal conduct, (2) expression of a negative attitude toward the employee's report, (3) failure to adhere to established company policies regarding employment decisions, (4) discriminatory treatment in comparison to similarly situated employees, and (5) evidence that the stated reason for the adverse employment action was false. *Zimlich*, 29 S.W.3d at 69. These factors do not replace the causation standard "that the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did," nor must every factor weigh in favor of the employee; "[s]ome of the factors may actually be a distraction." *Apache Corp.*, 627 S.W.3d at 335–36 (quoting *Hinds*, 904 S.W.2d at 636). Additionally, an employee is not required to prove his protected conduct was the sole reason for his termination. *Hinds*, 904 S.W.2d at 634.

There is no dispute Briggs was against the DEC, a project to which appellees were dedicated. Approximately six months to a year before the city council ultimately voted to approve the DEC, Briggs asked for an independent review of the project and the broader Renewable Denton Plan. This review did not uncover any unfavorable information regarding the DEC. Shortly before the city council was to vote, Briggs requested emails from former interim City Manager Martin regarding

DME and the DEC. She was concerned there had been improper conduct between DME employees and DEC vendors. After she disclosed the emails to the newspaper in September 2016, the city council was provided copies of the emails, the vote was delayed so that council members could review the emails, and ultimately the city council found no issues with the procurement process and approved the DEC.

In 2017, the City underwent multiple changes. City Manager Hileman was hired, and former interim City Manager Martin resigned; former City Attorney Burgess retired, and Assistant City Attorney Aaron Leal was promoted to City Attorney; and several members of the city council announced they would not be running again, causing the new majority of city council to be opposed to the DEC. The city council was responsible for hiring and firing the city manager and city attorney.

City Manager Hileman held a meeting on March 31, 2017, which included Deputy City Manager Langley and managers from DME, such as Grim, Bill Bunselmeyer, and Phil Williams, who was the General Manager of DME. Hileman told DME they needed to manage their expectations because the makeup of the city council had changed, and the new city council probably would not have approved the DEC. He instructed them there needed to be more transparency with the public and fewer closed sessions regarding City business. Hileman also encouraged them to let the past go and reset their feelings. Later that day, Hileman held a second meeting regarding who had authority to execute certain documents, such as

confidentiality agreements, and was concerned Grim did not have authority to execute such agreements with vendors. Langley and Assistant City Attorney Collister were present. Hileman also told DME managers there was a lack of trust in DME, a lack of civility, and DME staff did not know how to interact with other staff. According to Grim, Hileman said legal was "keeping book on DME."

The City, with the city council's approval, then hired outside investigators to investigate DME and the procurement process related to the DEC. During the two separate investigations, appellees, Williams, and Bunselmeyer were placed on administrative leave. According to Grim, he was interrogated for hours, after having to wait in Hileman's office for multiple hours before the interrogation began. Ultimately, Williams was forced to resign and Bunselmeyer returned for a short time before retiring. Appellees were terminated. The termination letter to Grim provided:

> The investigation has revealed information that has caused me to lose confidence in your ability to manage. I find that you were not candid and forthright during the interview on June 30, 2017, and this has caused me to lose trust in you.
>
> As a high level manager, this breach of trust cannot be repaired, and therefore, you are terminated effectively immediately.

The termination letter to Maynard provided:

> The investigation has revealed that you did not comply with the order given to you on June 28, 2017. This order required you to cooperate and be truthful during the investigation. You provided inaccurate and misleading responses during the interview.
>
> As a result, I no longer trust you. Therefore, you are terminated effectively immediately.

–31–

Both letters were signed by Deputy City Manager Langley.

Appellees presented evidence that the investigation into their conduct with DEC vendors—the very same vendors whose information was disclosed to the newspaper by Briggs—was initiated by City Attorney Leal and Assistant City Attorney Collister when they told Hileman about Grim's hunting trip with one of the vendors. Hileman then asked the city attorney's office and Deputy City Manager Langley to investigate. Although Hileman and Langley denied knowing appellees were the ones who reported Briggs, Leal and Collister knew of the report as they were involved in email discussions immediately following the report regarding the confidentiality of the documents. Hileman and Langley also admitted at trial they knew the disclosure occurred. Langley learned about it from former interim City Manager Martin around the time it occurred. He denied knowing what was disclosed and testified he did not remember any city council discussion regarding the emails prior to their vote for the DEC. Hileman testified the mayor and former City Attorney Burgess told him about it when he became city manager.

The City relies on *Rodriguez* to support its argument that knowledge by some City employees of appellees' report is not sufficient to show causation when there is no evidence the decision maker had knowledge of the report. *See* 605 S.W.3d at 193 ("Evidence of one decisionmaker's improper motive, however, cannot be imputed to all of the decisionmakers—or to the final decision—without evidence that the

improper motive influenced the final decision."). We find *Rodriguez* to be distinguishable from the circumstances here. In *Rodriguez*, the Office of the Attorney General had already received numerous complaints from Rodriguez's coworkers about her management before she made her whistleblower report. *Id.* at 185–86. Here, there is no evidence there were any issues with appellees until after their report of Briggs, after City management changed, and after repeated investigations into the procurement process that never amounted to any finding of wrongdoing. Furthermore, Rodriguez's termination had been requested by her new manager who knew nothing of Rodriguez's prior report and who had numerous issues with Rodriguez's ability to carry out her responsibilities. *Id.* at 190. The difference here is that the two people, Leal and Collister, who initiated the investigation into the procurement process even after the city council previously found no issues, did know about appellees' report as they were assistant city attorneys and were involved in handling the reported violation and reviewing the documents Briggs disclosed to the newspaper. It was these repeated investigations into appellees that led to Langley's decision to fire them.

Interestingly, in the City's investigation into whether there were issues with the procurement process, the City never interviewed Elton Brock, who was the City's former purchasing manager and who was in charge of the procurement process. The evidence also showed the city attorney's office had hired two outside counsel that were well versed in the purchasing process to oversee DME during the

procurement process to prevent any issues from arising. The City's investigation did not reveal any violations of the procurement process by appellees; however, it was suggested the procurement process "should have been re-started to resolve appearances of impropriety." There was no evidence of fraud or criminal activity with either employees or vendors, and nothing was identified that would invalidate the contracts. There was also no evidence the City even had a specific policy regarding the procurement process. Instead, the City alleged that during the investigation appellees lied and the City lost faith in Grim's ability to manage despite the fact that he had just been given an evaluation rating him at a "5" for "leading performance," the highest level, and despite Langley praising Grim during the investigation for being open and honest. The jury was free to believe the City's investigation was a sham and that the decision makers knew more about appellees' report of Briggs than they admitted.

As to the second factor, the parties agree there is no evidence of a negative attitude toward appellees' report of Briggs, and our review of the record confirms no one from the City expressed a negative attitude regarding the report.

We next turn to whether the City failed to adhere to established City policies regarding employment decisions. The City Charter provided: "Neither the council nor any of its members shall direct or request the appointment of any person to, or his or her removal from, office by any officer appointed by the city council under . . . this Charter or by any of his or her subordinates." Appellees presented evidence

–34–

that would allow a factfinder to make a reasonable inference the city council was involved, at least to some extent, in the terminations of appellees despite the City's repeated denial that such occurred.

Jose Gaytan, who worked at DME with appellees, testified Assistant City Attorney Collister, who initiated the investigation, said "that the council got the heads on pikes that they wanted" during a meeting that occurred after appellees were terminated. Stephen Johnson testified similarly, as he heard Collister say "the council has the heads on pikes they were looking for." Johnson testified he "was a little shocked by the statement."

Hileman's response to an email Briggs sent regarding the investigation also shows Briggs may have been more involved than she admitted. A non-council member emailed Briggs and asked whether Hileman's announcement about the DME investigation was going to come during Tuesday's meeting. Briggs asked Hileman who responded, "I'm thinking this through and will discuss with the council on Tuesday. Strategy changed a little bit based on a meeting Friday."

And lastly, the reason given to Williams requiring his resignation was also linked back to the city council. According to Williams, Hileman told him he no longer had any support from the council and he needed to resign that day. Hileman said if Williams did not resign Hileman would write a bad review and Williams would be terminated. Hileman and Langley testified these comments were not made to Williams but, instead, they discussed Williams's poor performance and gave him

a choice whether to resign. However, the jury was free to disbelieve Hileman and Langley.

The City also contends appellees were not treated differently than similarly situated employees. Appellees presented evidence Williams and Bunselmeyer were also investigated for improper conduct with vendors but Williams was given the option to resign and Bunselmeyer was allowed to come back to work after he was placed on administrative leave. The City argues the four employees are not similarly situated because Williams and Bunselmeyer did not lie during the investigation. However, whether appellees lied during their interviews was hotly disputed at trial. The interviews were admitted as evidence and available for the jury to review.

Grim repeatedly denied he lied to Langley about the trips with vendors. Maynard admitted he lied during the beginning of his interview but that he then told the truth. According to appellees, they were never asked about the trips prior to their interviews in June. Both characterized the interviews as aggressive interrogations, and Maynard testified he believed the interrogation was a witch hunt and there was not anything he could do or say in the interrogation to keep his job; the outcome was predetermined.

The jury, as the sole judge of the credibility of the witnesses and the weight to be afforded their testimony, was free to believe the City's investigation into appellees was merely a means to fire them for reporting Briggs. *See City of Keller*, 168 S.W.3d at 819–20; *McGalliard*, 722 S.W.2d at 697. We also disagree with the

City that appellees were required to show Briggs was directly involved in their termination in order to show their report of Briggs caused their termination. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (rejecting employer's argument that employer is liable only if the de facto decision maker is motivated by discriminatory animus; describing cat's paw theory and holding, in USERRA case,[29] "if [another] supervisor performs an act motivated by [unlawful] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable"); *Zamora v. City of Houston*, 798 F.3d 326, 332–33 (5th Cir. 2015) (discussing *Staub* and stating, "cat's paw analysis remains viable in the but-for causation context"); *see also Zimlich*, 29 S.W.3d at 70 (discussing other cases that have approved of "conduit" theory but stating court need not consider whether liability could be based on such a theory). Although their terminations took place ten months after their report of Briggs, the timeline shows once Hileman came on as the new city manager, and once the makeup of city council changed to be opposed to the DEC and aligned with Briggs, the City began investigating appellees for improper contacts with vendors even though such had already been reviewed and discussed at length before the prior city council members voted to approve the DEC. The evidence also showed appellees were treated differently than other similarly situated employees. A

---

[29] *See* Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. § 4311.

reasonable factfinder could have concluded appellees' terminations would not have occurred but for their report of Briggs. *See City of Keller*, 168 S.W.3d at 827. Therefore, the evidence is legally sufficient to sustain the jury's finding on this issue.

We also conclude the evidence is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust and is, therefore, factually sufficient to support the jury's finding on causation. *Cain*, 709 S.W.2d at 176; *Coats*, 607 S.W.3d at 380–81.

We overrule the City's second issue.

### V. CONCLUSION

We affirm the trial court's judgment.

/Ken Molberg/
KEN MOLBERG
JUSTICE

Pedersen, III, J., dissenting.

200945F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CITY OF DENTON, Appellant

No. 05-20-00945-CV        V.

MICHAEL GRIM AND JIM
MAYNARD, Appellees

On Appeal from the 68th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-17-08139.
Opinion delivered by Justice
Molberg. Justices Pedersen, III and
Smith participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee MICHAEL GRIM AND JIM MAYNARD recover their costs of this appeal from appellant CITY OF DENTON.

Judgment entered August 29, 2022